[In Bank.—January 31, 1884.]

JOSEPH EMERIC, RESPONDENT, *v.* JUAN B. ALVA-RADO ET AL., RESPONDENTS, AND EMILY TEWKS-BURY, EXECUTRIX OF THE WILL OF JACOB M. TEWKSBURY, DECEASED, ET AL., APPELLANTS.

PRACTICE— NEW TRIAL—NOTICE OF MOTION—ORDER EXTENDING TIME.—The time named in an order extending the time to give notice of intention to move for a new trial commences to run at the expiration of the ten days allowed by statute for the notice.

ID.— JUDGMENT ROLL—INTERLOCUTORY JUDGMENT—PARTITION.—The Code of Civil Procedure does not provide for a judgment roll until final judgment has been entered; and hence an appeal from an interlocutory judgment in a suit for partition will not be dismissed because the entire judgment roll is not brought up.

ID.— APPEAL—BILL OF EXCEPTIONS.—An appeal from an order denying a new trial, in the case of an interlocutory judgment in partition, must be brought up on a statement, or bill of exceptions, or affidavits, as in other cases where a motion for a new trial is made and denied.

TESTAMENTARY EXECUTOR— TRANSLATION.—The words "testamentary executor" are a correct translation of the Spanish word *albacea.*

MEXICAN LAW—GRANT.— Under the Mexican law an heir—*heredero*—could be instituted by will. And where in the proceedings to obtain a grant of land a Mexican governor decrees that a certain deceased testator was the lawful owner of a tract of land, and by his demise his successors—*herederos*—are the lawful owners, and orders that a deed be made out and delivered to the testamentary executor for the ends required, a grant subsequently issued to such successors—*herederos*—inures to the benefit of the successors appointed by the will of the testator.

EVIDENCE—IMMATERIAL ERROR.—A judgment will not be reversed for the erroneous admission of a document when it is evident that the document could work no injury to any party to the action.

LXVI. CAL.—34.

ID. — CONSTRUCTION OF WILL — INHERITANCE. — Under the Mexican law, where a father dies, having devised his estate to his wife and children in certain proportions, and after his death certain of the children die intestate, the interests of the children vest in the mother as the nearest ascendant, and not in the brothers and sisters.

FINDING—CONFLICTING EVIDENCE.—A finding on a material issue will not be disturbed on appeal when the evidence upon which the finding is based was conflicting.

CONVEYANCE — DEED INTER PARTES. — By the terms of a deed of partition in which a number of tenants in common were named as parties, each party conveyed his interest in the entire premises to the others, in consideration of a conveyance to him by the others of a certain specified portion. The deed was not signed by all of the parties named in it. Held, that the deed was inoperative, and the attempted partition null and void.

PARTITION BY AGREEMENT.—Partition of a Mexican grant, the boundary of which had not been fixed by the United States, made in accordance with a written agreement for partition, is void, when a larger tract was included in the partition than in the approved survey subsequently establishing the boundary.

CONTRACT TO CONVEY—CONSIDERATION.—An agreement by which one party agrees to convey lands to another in consideration of the rendition of certain services, gives no right to such lands until the services have been rendered.

ESTOPPEL — CONVEYANCE — EQUITY. — A party who accepts a conveyance of an undivided interest in a tract of land, which in terms declares that it is in lieu of a previous deed conveying specific portions of the land by metes and bounds, is estopped from claiming under the previous deed. In equity he is divested of his former title.

JUDGMENT — COSTS. — Under the provisions of the Practice Act of 1851, a judgment for costs, the amount of which was inserted by the clerk after the entry of the judgment, was void. No title passes to the purchaser of land sold upon execution under such a judgment.

EVIDENCE—PETITION FOR CONFIRMATION OF MEXICAN GRANT.—The petition of an executor to the board of land commissioners for confirmation of his testator's claim to lands under a Mexican grant is admissible in evidence in connection with a copy of the will, the opinion of the board confirming the claim, and the decree of confirmation.

ID. —DEED OF TRUSTEE. — A deed by a trustee of lands purporting to convey the legal title to the various parties in interest, in the proportion of their several shares, is admissible in evidence. The legal effect of the evidence is a matter for subsequent consideration by the court.

JUDGMENT ROLL — PETITION FOR APPOINTMENT OF GUARDIAN AD LITEM. — Neither the petition for the appointment of a guardian ad litem of a minor, nor the order of appointment would form part of the judgment roll in an action for partition, when the roll is finally made up, and will not be reviewed on an appeal from an interlocutory judgment alone.

GUARDIAN AD LITEM. — APPOINTMENT. — The appointment of a guardian ad litem may be made on an application ore tenus, in open court, although it would be better practice to file a petition alleging the facts requisite to show the jurisdiction of the court.

PRACTICE — PARTIES — MINORS. — In partition it is not necessary to issue or serve a summons to bring in infant defendants who become necessary parties during the pendency of the suit as successors of deceased defendants. They may be brought in and the case continued against them by motion and order of court.

ID. — PRESUMPTION. — SERVICE OF SUMMONS.—To sustain the judgment of the court below, the appellate court will presume, until the contrary be made to appear, that minor defendants who were non-residents of the State at the commencement of the action, and who were served with summons by publication, were over the age of fourteen years, and that no service of the summons or complaint upon the parents or persons having them in charge was required.

Id. — Appearance. — Where minor defendants have been served with summons and have answered by their general guardian or guardian *ad litem*, the court will assume, when the record is silent, that the appointment of the guardian was regularly made.

Id. — Practice — Irregularity. — An appearance for a minor defendant by guardian *ad litem*, without the authority of an order of the court, is an irregularity, which may be objected to by a motion to strike out the answer. If the motion be denied, a bill of exceptions may be taken, or the objection may be raised by affidavits on motion for a new trial, under section 658 of the Code of Civil Procedure. The irregularity does not render the judgment void.

Findings — Conclusions of Law. — Findings of a court should state separately the facts found, and the conclusions of law. The facts should be found specially and unmixed with the law, so that it may be seen that the conclusions of law are a necessary deduction from the facts.

Id. — Tax Deed. — A finding that there was no tax assessment or tax levy upon certain property for a particular fiscal year is not a finding of facts upon which the appellate court can determine the validity of a paper purporting to be a tax deed.

Adverse Possession — Evidence. — On appeal the court will not consider the sufficiency of evidence relied on to sustain a finding as to the character of an adverse possession, when it clearly appears that the possession could not have continued for a sufficient length of time to constitute a defense under the Statute of Limitations.

Partition — Interlocutory Decree — Original Co-tenants — Title — Referees. — In an action for partition only one interlocutory decree or judgment is provided for by the Code of Civil Procedure. Under section 760 the court may, as preliminary and ancillary to the judgment, and as an aid in reaching it, ascertain and determine the shares and interests respectively held by the original co-tenants, and cause a partition to be made as if such original co-tenants were the sole parties in interest. It must then proceed to adjudge and determine the share or portion of each party to the cause. An interlocutory decree or judgment may then be made and entered, which shall adjudge and clearly set forth the rights and shares of each of the parties to the action. These shares must be so specified and declared in the decree, that the referees who may be appointed to make the partition may divide and allot the several portions to each of the parties without having to determine any question of title. All such questions must be determined by the court.

Construction of Code — Conflicting Provisions. — The different sections of a chapter in any one of the Codes must be so construed as to reconcile all apparent conflicts, and if there are conflicting provisions in the different sections of a chapter, the provisions of the section last in numerical order must prevail, unless such construction is inconsistent with the meaning of the chapter.

Judgment — Exhibits. — Where a map or other paper is referred to in a judgment, it should be identified by the judgment and made part of it. It should not be referred to as a paper recorded elsewhere.

Appeal — Order Appointing Receiver. — An order appointing a receiver in an action for partition is not an appealable order.

APPEAL from an interlocutory judgment in partition of the late District Court of the Fifteenth Judicial District in and for the city and county of San Francisco, and from an order refusing a new trial, and an order appointing a receiver.

The action was for the partition of the "Rancho San Pablo," being seventeen thousand nine hundred and thirty-eight and

fifty-nine one-hundredths acres of land in the county of Contra Costa. The defendants were several hundred in number, and comprised many minors. The action was commenced in November, 1867. The interlocutory judgment was rendered on the 15th day of July, 1878. During the pendency of the action a large number of minors were made defendants as successors in interest of original defendants. Five appeals were taken, two from the interlocutory decree, one from an order denying a new trial, and two from an order appointing a receiver. The appeals were all considered and decided together. · The District Court found that a division of the rancho could be made without prejudice to the owners, and then made the following finding: "That it is impracticable and highly inconvenient to make a complete partition of said rancho in the first instance among all the parties in interest, but it is practicable and convenient to ascertain and determine the shares and interests respectively held by the original co-tenants, who were also tenants in common in said tract of land, and thereupon to adjudge and cause a partition to be made as if such original co-tenants were the parties, and the sole parties in interest, and the only parties to the action; and afterwards to proceed in like manner to adjudge and make partition separately of each share or portion so ascertained and allotted as between those claiming under such original co-tenants, to whom the same shall have been so set apart, or allow them to remain tenants in common thereof as they may desire." The court found the shares of the several original co-tenants, and made a decree apportioning the land accordingly. The remaining facts are very fully stated in the opinion of MR. JUSTICE THORNTON.

*B. S. Brooks,* for certain Appellants.

Francisco Maria Castro never had any title, legal or equitable, which he could transmit.

Whatever power the government of Mexico had to grant lands ceased with the change of government; that is, in 1821 when it became a republic. (*Alexander* v. *Roulet,* 13 Wall. 386; Dwinelle's Colonial History, 40-42, §§ 54-57.)

The *Deputacion Provincial* never had any authority to grant

lands. (*Beard* v. *Federy*, 3 Wall. 491; *Hornsby* v. *U. S.* 10 Wall. 231, 238; *U. S.* v. *Vigil*, 13 Wall. 450, 451; *U. S.* v. *Workman*, 1 Wall. 762; *Christy* v. *Pridgeon*, 4 Wall. 203; *Ferris* v. *Coover*, 10 Cal. 589.)

On the 18th day of August, 1824, the decree of colonization was passed, which was, after its passage, the *only authority* for granting lands. (*U. S.* v. *Workman*, 1 Wall. 762; *U. S.* v. *Vallejo*, 1 Black, 541; Dwinelle's Col. Hist. p. 42, §§ 56, 57, Appendix, p. 23, Nos. 12, 24; Lassepes, History of Colonization, 14; Instruccion de Negrete, Lassepes, 207; Decree of Santa Ana, Lassepes, 234.) We claim that he did not acquire title under this act. Long continued possession of land by Castro did not create a title. (*Serrano* v. *U. S.* 5 Wall. 451; *Nieto* v. *Carpenter*, 21 Cal. 455.) A license to occupy does not create a devisable estate. ( *De Haro* v. *U. S.* 5 Wall. 622, 627; 2 Hare & Wall. Am. Lead. Cas. 376, (4th ed. 733–736); notes to *Prince* v. *Case*, and *Rerick* v. *Kern*; *Hall* v. *Russell*, 101 U. S. 503–514; see also *Mott* v. *Reyes*, 45 Cal. 379; *Miller* v. *Dale*, 44 Cal. 562; *Varick* v. *Edwards*, 1 Hoffm. Ch. R. 381.)

The children were forced heirs, and if Francisco M. Castro had title, he could not will it away from them.

This was the general law of Spain and Mexico. (*Crozet's Heirs* v. *Gaudet*, 6 Martin N. S. 524; *Sennett* v. *Sennett's Legatees*, 3 Martin N. S. 417; *Parquin* v. *Finch*, 1 Martin N. S. 465; Law 8, tit. 20, lib. 10, Novisimo Rec'n, Law 12, tit. 6, lib. 5, Recopilacion, Law 28, de Toro, explaining and limiting Law 9, tit. 5, lib. 3, and Law 7, tit. 12, lib. 3, of the Fuero Real, Law 17, tit. 1, Las Siete Partidas, and Law 21, tit. 3, Partida 6; 1 White's New Recopilacion, 104, 107, being Azo & Manuel's Institutes, lib. 2, tit. 3, ch. 2, § 3; Escriche, Diccionario, verb. "Heredero Forzoso"; Febrero Novisimo, lib. 2, tit. 2, ch. 2, §§ 13–15; Febrero Novisimo, lib. 2, tit. 2, ch. 3, §§ 13, 14; Febrero Adicionado, part 1, ch. 1, § 2, No. 52; Alvarez, Derecho Real, vol. 1, tit. 14, p. 230; Sala, Ilustracion Der. Real, vol. 1, lib. 2, tit. 6, No. 1; Tapia, Prontuario, vol. 2, tit. 6, p. 52; Livingston's Louisiana Code, 1616; Nov. Rec'n, lib. 1, tit. 8, p. 6; Laws 8–11, tit. 7, Partida 6.)

The language of the will does not import a transfer of the fee.

Whatever the widow of Castro acquired from her husband would be *bienes reservables*, and she would only have a life estate. (1 Feb. Ad. 242, part 1, ch. 3, Nos. 1, 2; 4 Feb. Ad. 338, part 2, lib. 1, ch. 6, § 1, No. 27; Law 1, tit. 2, lib. 3, Fuero Real; 1 Feb. Nov. 580, lib. 2, tit. 2, ch. 24, Nos. 1, 2, 25, 26, 27; Law 25, tit. 13, Partida 5; Livingston's Code, art. 1739; Civil Code of France, art. 1094; Escriche's Dictionary, Bienios Reservables; Schmidt's Civil Law, Spain & M. arts. 1203–1207; 1 Feb. Ad. 243, ch. 3, No. 2; 1 Feb. Nov. 580, lib. 2, tit. 2, ch. 24, No. 2; 1 Sala, Il. D. R. 256, 257; Schmidt, Civil Law of Spain & Mexico, art. 1205.)

The title was granted by Governor Figueroa to the *herederos* of F. M. Castro, and his widow was not one of them.

The governor had power to grant the land, to create a title, not to determine that F. M. Castro was owner; and he could not grant to a dead man. Such a grant would be a nullity. (*McCreery* v. *Everding*, 44 Cal. 284; *Galt* v. *Galloway*, 4 Peters, 332; *Wood* v. *Ferguson*, 7 Ohio St. 288; *McDonald* v. *Smalley*, 6 Peters, 261; *Smith* v. *Smith*, 4 McCord, 276; *Galloway* v. *Finley*, 12 Peters, 298; *Price* v. *Johnston*, 1 Ohio St. 390; *McCracken's Heirs* v. *Beall*, 3 Marsh. A. K. 210; *Turver* v. *Smith*, 38 Ala. 135; *Thomas* v. *Wyatt*, 25 Mo. 26; *Thomas* v. *Boerner*, 25 Mo. 27; *Davenport* v. *Lamb*, 13 Wall. 427.)

" The institution which parents have to make of their legitimate children should be direct and not oblique, or by trustee." (1 Febrero Adicionado, part 1, ch. 1, § 2, No. 54, citing a multitude of authorities in note 1.)

If Doña Gabriela acquired any title beyond a life estate, her deed of August 12, 1851, was void for want of sufficient mental capacity to make it.

The partition of 1856 was and is valid, notwithstanding the instrument was not signed by all of the parties. It is not a valid objection that commissioners who acted under the authority of the instrument divided more land than they became entitled to by the final decree of confirmation. The agreement for partition gives the boundaries of the land as given in the original grant.

Even if the instrument were imperfect, it would be valid as a compromise.

The acceptance of the lieu deeds did not estop the grantees from claiming under their original deeds, or divest them of the titles legal and equitable, which vested in them thereby. Recital does not estop. (10 Vin. Abr. 454.)

" A party making a deed is not estopped by recitals unnecessary to the conveyance." (*Osborne* v. *Endicott*, 6 Cal. 149; see also *Rhine* v. *Ellen*, 36 Cal. 371; *Ingersoll* v. *Truebody*, 40 Cal. 603; *Reed* v. *McCourt*, 41 N. Y. 435; 10 Vin. Abr. 421, 432, 454, 455, 456, 461; *Champlain & St. L. R. R.* v. *Valentine*, 19 Barb. 487; *Averill* v. *Wilson*, 4 Barb. 180; *Carpenter* v. *Butler*, 8 Mees. & W. 209; *Cardwell* v. *Lucas*, 2 Mees. & W. 116; *Jackson* v. *Streeter*, 5 Cowen, 529; Tomlin Dic., Deed; 2 Blackst. Com. 296; *Osterhout* v. *Shoemaker*, 3 Hill, 518; 1 Saund. 215, n. *b;* *Wilson* v. *Worlfryes*, 6 Maule & S. 341; *Metcalfe* v. *Rycroft*, 6 Maule &. S. 77; *Strowd* v. *Willis*, Cro. Eliz. 362; 35 Hen. 6; *Buckley* v. *Thomas*, Plow. 130; 10 Vin. Abr. 460, 461.)

The sales under the judgments against P. A. M. Castro were valid, and conveyed his interest. It is the duty of the clerk to make up the judgment roll, and insert the amount of costs, and his neglect to do so does not affect the execution, or the validity of sales under it. (*Cotes* v. *Smith*, 29 How. Pr. 327; *Lentilhon* v. *City of N. Y.* 3 Sand. 722; *Macomber* v. *The Mayor*, 17 Abb. Pr. 46; Cal. Pr. Act. § 203; *Renouil* v. *Harris*, 2 Sand. 645; *Earle* v. *Barnard*, 22 How. Pr. 442; *Cook* v. *Dickerson*, 1 Duer, 679; *De Witt* v. *Swift*, 3 How. Pr. 281.)

The title of the purchaser at sheriff's sale, upon execution, cannot be affected by any error or irregularity in the judgment or execution. (*Armstrong* v. *Jackson*, 1 Blackf. 211; *Fraker* v. *Brown*, 2 Blackf. 298; *Averill* v. *Wilson*, 4 Barb. 183; *Mayo* v. *Foley*, 40 Cal. 281; *Succession of Foster*, 23 La. An. 100; *Gowen* v. *Smith*, 50 N. H. 166; *Isler* v. *Brown*, 66 N. C. 556; *Isler* v. *Brown*, 67 N. C. 175; *Faulk* v. *Kellums*, 54 Ill. 188; *Booth* v. *Farmers'* etc. *Bank*, 4 Lans. 301; *Hamman* v. *Lewis*, 34 Tex. 474; *McCutchen* v. *Dougherty*, 44 Miss. 419; *Fullerton* v. *Kelliher*, 48 Mo. 542; *Potter* v. *Eaton*, 26 Mass. 382; *Dutton* v. *Hobson*, 7 Kan. 196; *Armstrong* v. *Grant*, 7 Kan. 285; *McMartin* v. *McLean*, 49 Mo. 361; *South Fork Canal Co.* v. *Gordon*, 2 Abb. U. S. 479; *McAusland* v. *Pundt*, 1 Neb.

211; *Storm* v. *Smith,* 43 Miss. 497; *Garrett* v. *Lynch,* 45 Ala. 204; *Sinnett* v. *Cralle,* 4 W. Va. 600.)

The tax deeds were valid and so were the assessments and judicial and other proceedings on which they were based. (*Eitel* v. *Foote,* 39 Cal. 439; *Jones* v. *Gillis,* 45 Cal. 541; *Mayo* v. *Ah Loy,* 32 Cal. 477; *Reily* v. *Lancaster,* 39 Cal. 354; *Gillis* v. *Barnett,* 38 Cal. 393; *People* v. *Fox,* 39 Cal. 621.)

When a deed is made *prima facie* evidence of title and possession, a compliance with the conditions of sale are primarily to be presumed. (*Mumford* v. *Wordell,* 6 Wall. 423.) One alleging non-compliance must prove it. (*Williams* v. *Kirtland,* 13 Wall. 306; *Abbott* v. *Londenbower,* 46 Mo. 291.) The legislature may constitutionally declare the deed *prima facie* evidence, but not conclusive. (*Sprague* v. *Pitt,* McCahon, 212; *Cook* v. *Hackleman,* 45 Mo. 317; *O'Grady* v. *Barnhisel,* 23 Cal. 291; *Brunn* v. *Murphy,* 29 Cal. 326; *Wetherbee* v. *Dunn,* 32 Cal. 106; Blackwell on Tax Titles, 70, 79.) The maxim *omnia præsumuntur rite esse acta* applies. (*Lackawanna I. Co.* v. *Fales,* 55 Pa. St. 90.) Recitals are necessary. (*Wetherbee* v. *Dunn,* 32 Cal. 106.) Sale *en masse* does not vitiate. (*Wallace* v. *Berger,* 25 Iowa, 456.) The recitals need not be in words of the act. (*Bowman* v. *Cockrill,* 6 Kan. 310.) The order appointing a receiver is erroneous and unwarranted, and should be reversed.

The failure of the court to obtain jurisdiction of the minor heirs divested it of jurisdiction to proceed to judgment. (*Skinner* v. *Buck,* 29 Cal. 256; *McMinn* v. *Whelan,* 27 Cal. 314; *Requa* v. *Holmes,* 16 N. Y. 195; *Ewald* v. *Corbett,* 32 Cal. 499; *Goodenow* v. *Ewer,* 16 Cal. 465.) The executor does not represent the owners of the estate. (*Ewald* v. *Corbett,* 32 Cal. 498; *Burton* v. *Lies,* 21 Cal. 90, 91; *Beckett* v. *Selover,* 7 Cal. 216; *Updegraff* v. *Trask,* 18 Cal. 458.) The court has no jurisdiction to appoint a guardian until the infant is properly served. (*Gray* v. *Palmer,* 9 Cal. 616; *Nichols* v. *Mitchell,* 70 Ill. 258; *Galpin* v. *Page,* 18 Wall. 365.)

The case does not warrant the decree for a partition as between original tenants in common. It is the duty of the court by its decree to determine the interest of each party. A decree merely determining the rights of the original co-tenants is insufficient.

*Henry E Highton,* for certain Appellants, argued : —

1. That Francisco Maria Castro never acquired a title, legal or equitable, to the San Pablo Ranch or any part of it.

2. That Figueroa granted the title exclusively to the children.

3. That the deed from Gabriella Berreyessa, widow of Francisco Maria Castro, to her daughter, Martina Castro de Alvarado, wife of Juan B. Alvarado, dated August 4, 1851, was void, *first,* because the grantor had nothing to convey, and, *second,* because she had not legal capacity to make the conveyance.

And took the following positions : —

1. That the partition of 1856 was valid, because all the parties knew in advance that plaintiff, Emeric, would not assent to it, and notwithstanding that knowledge, made the agreement and carried it into effect, and provided for the plaintiff, Emeric's interest.

2. That the plaintiff, Emeric, having all the land to which he is entitled, outside of what he has derived from the Alvarados, under his arrangement with them, cannot, as *their* representative, attack that partition.

3. That the Alvarados, having ratified and approved the partition and accepted and held all its benefits, are estopped from attacking titles, under the guise of partition or in any other mode, which they themselves originated.

4. That the number of segregated possessions which have arisen under the San Pablo title, both before and after the agreement of 1856, and many of them protected by that agreement, rendered a partition as' between the original co-tenants, not only highly inconvenient, but wholly impracticable.

5. That, if it was necessary for a partition to be judicially made, then it should have followed as closely as possible the effectuated agreement of 1856.

6 That, in any partition, it was indispensable to respect the several holdings of tenants in common by derivative titles, and their improvements.

7. That the finding and decree of the court below are based upon antagonistic and irreconcilable theories and cannot be upheld.

In support of these positions counsel cited Code Civ. Proc. §§ 763, 764; *Slice* v. *Derrick*, 2 Rich. 629; *St. Felix* v. *Rankin*, 3 Edw. Ch. 342; *Conklin* v. *Conklin*, 3 Sand. Ch. 68; *Hitchcock and Wife* v. *Skinner W. Tredwell et al.* 1 Hoff. Ch. 27; *Town* v. *Needham*, 3 Paige, 555; *Ryerss* v. *Wheeler*, 25 Wend. 435; *Wood* v. *Fleet*, 36 N. Y. 511; 1 Washburn on Real Prop. (4th ed.) 678, and note 5; *Green* v. *Putnam*, 1 Barb. 509; *Piatt* v. *Hubbel*, 5 Ohio, 243; *Whaley* v. *Dawson*, 2 Schoales & L. 369.) But the lawyer's title is valid in itself. Contracts with attorneys are legal. (*Mahoney* v. *Bergin*, 41 Cal. 423; *Porter* v. *Peckham* 44 Cal. 208; *Hoffman* v. *Vallejo*, 45 Cal. 572; *Ballard* v. *Carr*, 48 Cal. 79; *Howard* v. *Throckmorton*, 48 Cal. 489.) The contract between Mrs. Alvarado and Musson was valid. (*Ingoldsby* v. *Juan*, 12 Cal. 564; *Bodley* v. *Ferguson*, 30 Cal. 516; *Racouillat* v. *Sansevain*, 32 Cal. 383.) If the power of attorney executed by Mrs. Alvarado was invalid, it became valid by subsequent legislation which acted retrospectively. (1 Hittell's General Law, art. 694, 715, 718.) The power of attorney was made valid by the Act of 1863. (*Dentzel* v. *Waldie*, 30 Cal. 139.) The deed of Martina Castro is void because her husband did not join in its execution, and the writing made by him following the acknowledgment of his wife is not a ratification. (*Ingoldsby* v. *Juan*, 12 Cal. 574; *Dow* v. *Gould & Curry Silver Mining Co.* 31 Cal. 643.)

*Theodore H. Hittell*, for Respondents.

*McClure, Dwinelle & Plaisance*, for Respondents Juan B. Alvarado and others.

It was the clear intent of the testator, Francisco Maria Castro, to make a will under the civil law, operating as a deed at the death of the devisor, which conveyed the fee simple absolute of one undivided half of the rancho to the widow Berreyessa. (*Tevis* v. *Pitcher*, 10 Cal. 465.) Only two witnesses were necessary to attest a will in California under the Mexican law. In Mexican jurisprudence, custom is sometimes allowed to establish a rule in contravention of the positive written law. (*Von Schmidt* v. *Huntington*, 1 Cal. 55; Escriche's Derecho Español, 23, 24; Escriche's Dic. title "Costumbre"; 1 Feb. Mej. 55–

61; *Panaud* v. *Jones,* 1 Cal. 498; 1 Sala, Mej. 248–253; Ley 6, tit. 2, part 1; 1 Pan. Mej. p. 614, No. 1418; 4 Sala, Mej. 623, Regla, 28; 1 Pan. Mej. 629, Regla, 29.)   By the customs of California under the Mexican rule, two witnesses were sufficient for a will.   (Domat, § 2983; 2 Feb. Mej. § 20; *Castro* v. *Castro,* 6 Cal. 158; *Adams* v. *Norris,* 23 How. 353; *Tevis* v. *Pitcher,* 10 Cal. 465; *Donner* v. *Palmer,* 31 Cal. 522; *Coppinger* v. *Rice,* 33 Cal. 422.)   The confirmation by the land commission was not to Joaquin Isidro Castro individually, but to him and his co-devisees.   But if the legal title did vest in him by the decree and patent, the record shows that he was acting in a fiduciary capacity for himself and co-devisees, and a court of equity will compel him to recognize their rights.   (*Clark* v. *Lockwood,* 21 Cal. 222; *Emeric* v. *Penniman,* 26 Cal. 119; *Salmon* v. *Symons,* 30 Cal. 301; *O'Connell* v. *Dougherty,* 32 Cal. 458; *Castro* v. *Hendricks,* 23 How. 441; *Wilson* v. *Castro,* 31 Cal. 420; *Hardy* v. *Harbin,* 1 Sawy. 205.)   The attempted conventional partition of 1856 was void.   (*Tewksbury* v. *O'Connell,* 21 Cal. 60; Laws 1850, p. 251, § 23; Laws 1863, p. 165, §§ 1–4; *Kendall* v. *Miller,* 9 Cal. 591; *Pease* v. *Barbeir,* 10 Cal. 437; *Ewald* v. *Corbett,* 32 Cal. 493; *McLeran* v. *Benton,* 43 Cal. 467.)   An order appointing a receiver is not an appealable order.   But the order was properly made.   (High on Receivers, §§ 9, 607; *Pignolet* v. *Bushe,* 28 How. Pr. 9; 2 Story's Eq. Jur. 826, 827; *Duncan* v. *Campau,* 15 Mich. 415; *Rutherford* v. *Jones,* 14 Ga. 521; *Hargrave* v. *Hargrave,* 9 Beav. 549; *Sandford* v. *Ballard,* 33 Beav. 401; *Evelyn* v. *Evelyn,* 2 Dick. 800; *Spratt* v. *Ahearne,* 1 Jones (Ir.) 50; *Street* v. *Anderton,* 4 Brown's Cas. (Ch.) 413; *Low* v. *Holmes,* 17 N. J. Eq. 148; *Jefferys* v. *Smith,* 1 Jacob & W. 298; Cal. Code Civ. Proc. § 564; 2 Wait's Pr. p. 216; Freeman on Cotenancy and Partition, § 327.)

*Garber, Thornton & Bishop,* for certain Respondents.

The court acquired jurisdiction of infants who appeared and defended by their several guardians, by such appearance, although summons was not served upon the infants.   (*Smith* v. *McDonald,* 42 Cal. 484; *Gronfier* v. *Puymirol,* 19 Cal. 629.)   As to infants who appeared and answered by guardians *ad litem,* in the

absence of evidence to the contrary, the presumption is that the order appointing the guardians was correctly made, that the infants were over fourteen years old, and that the guardians were appointed upon their application. (*Varian* v. *Stephens*, 2 Duer, 635; *Lyle* v. *Smith*, 13 How. Pr. 104.) An infant, when a suit is pending, may come in voluntarily to protect his rights. (*Disbrow* v. *Folger*, 5 Abb. Pr. 53.) Every presumption is indulged in favor of the order. (*Wilson* v. *Dougherty*, 45 Cal. 35; *Ornn* v. *National Bank*, 16 Kan. 341.) The order appointing a receiver is not appealable. (*Appeal of Houghton*, 42 Cal. 58; *Blum* v. *Brownstone*, 50 Cal. 294.)

THORNTON, J.—In this cause, which is an action for the partition of the San Pablo Ranch, situated 'in the county of Contra Costa, and containing seventeen thousand nine hundred and thirty-eight and fifty-nine one-hundredths acres of land, there are five appeals, each prosecuted by some of the defendants. Of these five appeals, two are from the interlocutory judgment or decree, one from an order denying a motion for a new trial made by several defendants, and the other two are from an order appointing a receiver. We are asked to strike out the bill of exceptions, on the ground that the notice of motion for a new trial and the bill of exceptions were not filed or served within the time allowed by law or by the court.

The interlocutory judgment was filed on the 15th of July, 1878, and notice of the filing of the findings and entry of judgment was served on the parties and attorneys on the next day. Seven days afterwards, viz., on the 23d of July, the parties intending to move for a new trial obtained from the Hon. Samuel H. Dwinelle, the judge of the court below, the following order:—

"Good cause appearing therefor, it is ordered that the time for the defendants, or any or each of them, to give notice of their intention to move for a new trial, and to serve a bill of exceptions, is hereby extended thirty days."

No stipulation of attorneys extending time was asked or given, and no other order was asked or granted than the foregoing. The foregoing order was a valid one. (Code Civ. Proc. § 1054.)

On the 24th of August, 1878, the notice of motion for a new trial was served, and on the same day the proposed bill of exceptions was served.

It is argued that the time was only extended by the order of the judge thirty days from the 23d of July—the date of the order—which would extend the time to the 22d of August, and therefore the notice of motion and bill of exceptions which were served on the 24th of August was too late by two days.

We do not so construe the order. We think it extended the time thirty days from the end of the period of ten days allowed by the Code of Civil Procedure, and that such was the intention of the learned judge who made the order. The parties intending to move had ten days from the 16th of July to give notice and serve their bill of exceptions. (Code Civ. Proc. § 650.) This would bring the ten days' period to a close on the 26th of July. The extension of thirty days would bring the end of the extended period to the 25th of August, and notice and bill were filed the day preceding, viz., on the 24th of August. The extension of time by the order referred to the ten days' period as the point from which the extension was to run and be computed. The order must have been made within the ten days, for the judge had no power to make it afterwards. No reference is made in the order to its date as the point from which the extension was to be computed, and we would be violating the rule made by the order of the learned judge of the court below were we thus to hold. We think the notice and bill were filed in time. (See *Green* v. *Fawcett*, No. 5,074, March 21, 1876; *Clark* v. *Crane*, 57 Cal. 629.)

We will remark here that the cause had been a long time on trial, that the transcript consists of more than seventeen hundred pages, and certainly the judge would be disposed to allow all the time in his power to prepare and serve a bill of exceptions. Remarkable diligence was used in preparing and serving it within the time allowed.

It is further urged that the appeal should be dismissed because the entire judgment roll is not brought up. Conceding that on an appeal from an interlocutory judgment in partition, the entire judgment roll, so far as it exists, is to be and can be brought up in the transcript on appeal, we remark that it is

not the practice of this court to dismiss an appeal under such circumstances, when the defect can be readily cured on a suggestion of diminution.   It is clear, however, that on such an appeal no judgment roll has been made up.   No final judgment has been rendered, and until final judgment has been made and entered, the judgment roll is not and cannot be required to be made.   (Code Civ. Proc. § 670.)   Before the *postea* and entry of judgment, according to what is known as the common-law procedure, the roll was known as the issue roll, or *nisi prius* roll; after the entry of judgment it was called the judgment roll.   (Bootes Suit at Law, 136, 142, 143; Stephen's Pl. 81; Abbott's Law Dict. verb. Judgment Record or Roll, citing Smith's Act. at Law, 184.)   This, however, applied only to cases at law.   No judgment roll was known in courts of equity.   The pleadings, process, depositions, orders of all kinds, upon being filed, and final decree when enrolled, in cases in chancery, went into and constituted the record.

The case before us, although courts of law had at an early period jurisdiction in cases of partition (1 Story's Eq. Jur. 646–648), partakes more of a case in equity.   However, it is sufficient to say, that no judgment roll is provided for by the procedure in this State until final judgment has been entered, and we do not see why the requirement contended for here should obtain.   The appeal should not be dismissed on the ground referred to, and the motion is denied.   If any party had desired any paper to be brought up, which would constitute a part of the record in the case when the roll is made up, and would be material on the examination and decision of the cause, on a suggestion or motion to that effect, leave would have been granted.

In holding that we will not dismiss the appeal because all the documents which constitute the judgment roll when made up after the final judgment is made and entered are not in the transcript, we do not intend to hold that the procedure by which questions are brought to the court for examination and review on appeal is otherwise changed.   The same mode might be adopted to bring questions for review before this court on appeal from an interlocutory judgment in partition, as on an appeal from a final judgment.   The same is true on appeal from a motion denying a new trial in the case of an interlocu-

tory judgment. The questions to be considered and decided on the denial of such a motion, when an interlocutory judgment has been rendered and entered, must be brought before us by a statement or bill of exceptions or affidavit, as in other cases when a motion for a new trial is moved for and denied. Such, in our judgment, is the fair construction of the Code of Civil Procedure. We think the other appeals should not be dismissed, except the appeal from the order appointing a receiver, which will be discussed elsewhere in this opinion.

It appears from the bill of exceptions that on the first day of January, 1827, the citizen, Francisco Castro, presented "to the commander-in-chief of the Californias," a petition, in which he speaks of himself as a former member of the deputation of the territory of Alta California, and stated that since the 15th of April, 1823, he presented to the territorial assembly (deputation) · a memorial, a true and faithful copy of which he appended to this memorial, as follows :—

"*Hon'ble Deputation:* Don Francisco Castro, member of the provincial assembly of Upper California, citizen of and resident in the town of San José, in the said province, with due respect presents himself to you and exposes :—

"That being the owner of large herds of horned cattle and horses, he finds himself under the necessity, in order to preserve the cattle which he now possesses, and in order to provide for the maintenance of his numerous family, to solicit of you that a piece or tract of land may be given to him for the purpose of fixing his establishment.

"Wherefore, I address myself to your high sense of justice, and ask of you that in the exercise of the ample powers with which you are invested, you would be pleased to grant to me the possession of three square leagues (sitios) in the place called 'Los Cuchigunes' or 'San Pablo,' formerly occupied by the mission of San Francisco, which lies opposite the said mission and the port of said name, and upon its shores ; which piece of land has been abandoned by the said mission, and which, with the previous knowledge of its holy fathers and father ministers, I had already solicited from the present government, who will testify to the fact if necessary.

"Feeling thus confident, as I do, that you will have the

kindness to consider myself entitled to this favor, I request and pray of you to give me the rights of property, possession, and ownership to the land in due form of law, so that it may be secured to me and my successors. Wherefore, I humbly solicit that you will look favorably at my demand, and do that which you will deem pertinent and necessary.

"Monterey, April 15, 1823.

"Honorable Deputation,

"FRANCISCO CASTRO."

That on the same day, 15th of April, 1823, the honorable assembly made the following decree or order:—

"MONTEREY, April 15, 1823.

"The Hon'ble Assembly [Deputation] grants to the claimant the piece of land which he solicits, measuring three square leagues, considering the said claimant entitled to said favor, for his services, his known probity, and the abundance of stock which he possesses, for which purpose the government appoints the commander of the presidio of San Francisco for the measurement, and giving him possession of the lands for which he petitions.

"ARGUELLO.

"José JOAQUIN DE LA TERRE, Secretary."

The above is made part of the petition.

The petition concludes as follows: "Considering that to the present time the foregoing decree has not been complied with, the reason thereof being unknown to me, I present myself to you in order that, making use of the powers with which you are invested, you will be pleased to give the orders necessary for the purpose of having the foregoing decree enforced. The highly discriminating powers which distinguish you make me confident that you will grant me this favor, for then only will I consider myself safely and permanently settled, and having nothing to fear either for my live stock or for the sundry branches of industry, and to the maintenance of my family. This last point being the first which occupies my attention.

"Wherefore, I respectfully pray, that taking my petition into consideration, you will be pleased to order all that which you will deem pertinent and reasonable, which favor will, I hope, be granted to me.

"In the presidio of San Francisco, 1st of January, 1827.

"FRANCISCO CASTRO."

On the margin of this petition to the commander-in-chief, the following order was made:—

"PORT OF SAN DIEGO, January 29, 1827.

"The commander of San Francisco will be pleased to report why the right of possession within referred to was not given.

"ECHEANDIA."

On the 27th of July, 1827, the above-named Castro presented a petition "to the commander-in-chief and political chief of the Californias." The petition begins as follows:—

"Francisco Castro, owner of the rancho San Pablo, in the district of San Francisco, respectfully presents himself to you, and in due form of law, and according to his rights, exposes." The petition proceeds to set forth that four years have elapsed since he became and continued in the possession of the said tract of land, as will appear by the document accompanying these presents, which document, granted by the honorable deputation, confirms the donation, and orders that due title to the possession of the land be given to him (Castro), and requires the commander of San Francisco to do so; that though the gentleman notified for the purpose of giving him said possession, as he (Castro) was at that time a member of the said deputation, and was then called to Monterey on public service, he could not obey said summons, and as from that day he had not been able to settle this matter, he now had recourse to the well-known justice of his excellency, requesting that he would be pleased to order that due possession of the tract of land be given to him. He asks his excellency to take also into consideration that he has already built upon the land a house, having stone foundations, measuring forty varas, two other wooden houses, planted a garden with many fruit trees therein, and a vineyard containing upwards of one thousand stalks of vines, built a mill, and sowed thirty fanegas of wheat, and one half a fanega of corn and beans each; and that he has six hundred head of cattle, and five hundred horses, more or less; that the tract of land runs along the bank of the creek (estero) and that of the bay (mar) of San Francisco, from north to northwest, where it meets the boundary line of Sergeant Luis Peralta; its distance from the mission of San José

is about thirteen leagues, and from that of San Rafael a little over two; that in order to go to the latter, one has to cross an arm of the sea, in consequence of which a boat has been built " so that one's family be not in want of spiritual food."

He concludes by asking that his excellency would be pleased to take his demand into consideration, and grant it if just. This petition is signed by Castro, and bears date at Monterey. He appends to it his petition to the territorial deputation and the decree of the same, above given. On this petition the following order was made: —

"Let the possession prayed for by the claimant be given to him, it being understood that the three sitios prayed for and granted are to measure three square leagues, and said possession being given to him on the place where he has erected his house, or wherever it may be most convenient, on the said sitios, bearing in mind that the measurement and putting in possession must begin from the place where his house is built, or from any other place pointed out by him; and that there must be measured therefrom seven thousand five hundred varas in each direction; and to that effect I appoint, as an intelligent and honest man, the citizen, Francisco de Haro, a resident of the presidio of San Francisco, so that he may, for and in behalf of the citizen Francisco, having previously called to his assistance two witnesses, and also the owners of the adjoining estates, and in their presence he may pass upon and operate in due form of law, and fulfill all the formalities prescribed and in furtherance of this decree.

"This done, that these two documents be sent back to me through the commander of the presidio of San Francisco, by whose channel I now forward them, in order that they may be complied with, and in order also that they may be registered in the book of records and possessions, which are kept in this office.                                      ESTRADA."

It further appears that Castro presented the following petition, dated the 30th of January, 1828, to the commander-in-chief: —

" *To the Commander-in-Chief:* Now comes the citizen, Francisco Castro, who says: That four years ago he petitioned his excellency, Don Luis Antonio Arguello, for the place called

'San Pablo,' claiming three square leagues out of it, which were granted to me by a decree in which he orders that due possession be given to me, as the person appointed for that purpose. Don Ignacio Martinez has not as yet to this day done it, on account of you having kept in your hands the documents upon which, and in consideration thereof, the usual legal proceedings are to be had, which shall confirm the grant and possession of the said piece of land. I now come and pray you to deliver to me the said document in your possession, so that the formalities prescribed may be complied with in furtherance of the request of the commissioners appointed.

" San Francisco, 30th January, 1828.

" FRANCISCO CASTRO."

It does not appear that any order or decree was made on this petition. On the 1st of May, 1830, he presented a further memorial, addressed to the political chief:—

" *To the Hon'ble the Political Chief:* Francisco Castro, of the town of San José, Guadalupe, residing on the rancho of San Pablo, respectfully comes to you and says, that he is the owner of the place called San Pablo; that it was granted to him five years ago by the hon'ble the territorial deputation. That taking in consideration the laws concerning the colonies and the supreme decree of your excellency, renews his claim to the possession of the said tract of land, which measures three sitios, and is such as described in the first claim presented by him, and now in the hands of your excellency, requesting you to remark, that although he has frequently requested that possession be given to him of said tract of land, that the same has not as yet been done. He therefore renews his claim that due possession be given to me of the said tract, and that the amount expended, and the improvements made by his family on the said land, should be taken into united action—the same consisting of a house, measuring ten varas, and having good foundations, one thousand stalks of vine, and sundry other plants.

" And in order that this claim be attended with a full knowledge of the facts, and justice rendered to him in the present instance, he will add that he is fifty-five years of age; that he is married and has ten children; was born in the town of Cinaloa, in the district of Sonora, which was founded by his father;

that he was for thirteen years a soldier and corporal in the Mexican company of artillery, and that he has belonging to him on the tract which he occupies, one thousand four hundred head of cattle, six hundred sheep, and five hundred horses. He would, therefore, respectfully request that in consideration of the services rendered by him, the possession of the said tract of land be granted to him, in order that he may in peace and quietness, and with confidence, go on with the improvements necessary for the maintenance of his numerous family, which favor from your well-known sense of justice will, he trusts, be granted to him.

  " Rancho of San Pablo, 1st of May, 1830.

          " FRANCISCO CASTRO."

The following marginal decree was made on the foregoing:—

        " MONTEREY, 26th May, 1830.

 " Let the plaintiff add to his petition a plan (diseño), showing the conformation, extent, and all other important particulars relating to the tract of land claimed by him.

          " ECHEANDIA."

No doubt the plan or diseño above spoken of related to the requirement of the rules and regulations of 1828, in relation to the granting of lands for colonization of the territories of the republic of Mexico, and that the law of 1824 and the regulations of 1828, had then been promulgated in California, and that the laws concerning the colonies referred to in the petition were the law and regulations above mentioned. On the 5th day of November, 1831, Francisco Castro died, having first made his will, which appears in the bill of exceptions. The will opened with the following recital:—

 " On the 21st day of October, 1831, I, Francisco Maria Castro, finding myself, by divine mercy, of sound mind, but severely sick, and desirous of disposing of my effects before I die, in the best possible form, in the absence of a notary public, having called all the witnesses who would willingly come, and asked and supplicated Diego Forbes y Rodriguez to write, in the presence of said witnesses, the following testament, which I will dictate in the form following."

 The will appears to have been very formally drawn up. Among other dispositions the following are made:—

"I order, and it is my will, that my wife, Gabriela Berrey-essa, shall have absolute title to one half of all my property, rights, and credits, with all the movables of my house, for her aliment and maintenance, in the same manner that she has had during my life, and I charge my children to comply with the direction or obligation, in the same manner as though it were with my person."

The following clause is inserted in a subsequent part of the will:—

"I order, and it is my will, to leave, as in fact I do leave and give, all my property, rights, and actions, together with all the land of my rancho San Pablo, to my wife one half, and the remaining half equally between my legitimate sons and daughters, each being owner of his equal part or share of the effects." The language of this clause without the other is sufficient to devise one half of the ranch to the wife.

The will contains these further clauses among others:—

"I pray and declare that it is my will to nominate, and I nominate and appoint for my executors of this my voluntary last testament, the following named persons: In the first place I appoint my son, Joaquin Isidro Castro, my first executor and holder of the property of my wife, my daughters and sons— Ramon, Victor, Jesus Maria, and Alvino Antonio, enjoining them to strict compliance with my ultimate wish, at the same time giving him all right and power to superintend and take care of the rights and effects corresponding to each one of those persons, that is to say: my wife, my legitimate daughters, and my sons aforementioned, and also to cause the rest of my children to comply with this my last wish.

"I nominate and appoint my son, Juan José Castro, as my second executor, and my son, Gabriel Vicente Castro, as my third executor, to carry out my last wish, and conferring upon them all the rights which the laws direct in these cases.

"I declare and direct all my executors that if any of my children attempt to introduce discord or difficulty of any kind in order to disturb the peace and quiet of my family, he or she be ejected the ranch immediately, without exception of person.

"I declare as my last wish, and direct that all my tame horses be for the use of my wife, my legitimate daughters, and

my sons Ramon, Victor, Jesus Maria, and Alvino Antonio. My horses number thirty, with two mules, which are for the use of my house.

"I direct, . . . . and it is my desire, that my youngest son shall be master or owner of my branding iron and cattle mark."

This will was signed by Castro on the 3d day of November, 1831, and was attested by three witnesses, who sign: "Carlos Castro, first witness to this testament; José Berreyessa, second witness to this testament; Diego Forbes y Rodriguez, third witness to this testament."

It will be observed that the testator appoints his son, Joaquin Isidro Castro, first executor of his will.

On the 26th of May, 1834, this son and first executor of the will presented to the political chief the following petition:—

"*To His Excellency, the Political Chief:* The citizen, Joaquin Isidro Castro, presents himself before your excellency, and in due form of law exposes:—

"That in consequence of the death of my father, who has instituted me the heir of a portion of his property, and guardian of that of my brothers (as will appear by his testament, a copy of which is registered in this capital), and in fulfillment of the obligations resulting from the trust which I have accepted, and for the due execution of the same, I solicit of your excellency the lawful ownership of a certain piece or tract of land named San Pablo, a plan of which is hereto annexed, together with a copy of the first petition for the said tract, presented by my father, and dated the 15th of April, 1823, and also a copy of gubernatorial decree of the same date, and the same having remained without effect, I hereby renew a demand for the said piece of land, together with the documents necessary for the security of the rural property therein situated, consisting of three thousand head of cattle, nine hundred horses, and six hundred sheep. I hereby solicit your excellency to do that which you will deem just and necessary in the premises, protesting my entire good faith, and taking the oath prescribed, etc.

"Rancho de San Pablo, May 26, 1834.

"JOAQUIN ISIDRO CASTRO."

On this petition the following marginal decree was made by José Figueroa, the political chief to whom it was addressed:—

"MONTEREY, June 1, 1834.

"Let the petitioner be notified to produce the original documents, in virtue of which the lands which he claims were granted, and a report be made of the same. I, Don José Figueroa, a general of brigade of the Mexican republic, commander-general, inspector, and political chief of the Territory of Upper California, so order and decree, and in faith thereof, thereunto affix my name.

"JOSÉ FIGUEROA.

"AGUSTIN V. ZAMORANO, Secretary."

To this decree Joaquin I. Castro made answer on the 11th of June, 1834. The answer is as follows:—

"This day, the 11th of June, 1834, the petitioner, Don Isidro Castro, being present, and the foregoing notification from the political chief having been duly served on him, and having been made acquainted with it and heard it read to him, declared and answered: That the original documents referred to in said notification are on file in the office of the secretary of the government, together with a petition of his deceased father, praying for a grant of said rancho; and having so answered in good faith thereof, he affixed thereto his signature, and so did also the secretary of the government.

"JOAQUIN ISIDRO CASTRO.

"AGUSTIN V. ZAMORANO."

On the same day, Governor Figueroa ordered that the secretary of the government report on this answer, annexing the documents referred to, and of the whole let an account be rendered in order to determine thereupon. The secretary, Zamorano, in conformity with the foregoing order, produced the documents referred to for such further orders as his excellency might be pleased to make. The documents referred to are those above given, consisting of the various petitions made by Francisco Castro in his lifetime, and the orders and decrees made thereon. On the petition of Joaquin above given, Governor Figueroa made this decree:—

"MONTEREY, June 12, 1834.

"Taking into consideration the petition at the head of this

expediente, the commission granted by the hon'ble the territorial deputation, on the 15th of April, 1823, and all steps taken and other things done in conformity with the requirements of the law on such matters, —

"We declare Don Francisco Maria Castro the lawful owner, and by his death his successors, of all that tract of land known under the name of Los Cuchigunes, or San Pablo, bounded by the ranchos of San Antonio and El Pinole, and by a portion of the port of San Francisco. Let, therefore, a title be delivered in conformity with the above, have it registered in the proper book, and handed over to the testamentary executor, Don Joaquin Isidro Castro, for the ends required, and have the expediente recorded.

"I, José Figueroa, general of brigade, commander-in-chief, general inspector, and superior political chief of the territory of Upper California, do so order and decree, and in faith here unto sign my name.

                                        "JOSÉ FIGUEROA.
"AG. V. ZAMORANO."

On the same day the following grant was made:—

"Whereas, the late Francisco Maria Castro petitioned the deputation on the 15th of April, 1823, a reversion in the tract of land known under the name of Los Cuchigunes, or San Pablo, bounded by the ranchos of San Antonio and El Pinole, and by a portion of the bay of San Francisco; and whereas, his successors did subsequently apply for the lawful ownership of the said tract of land, having previously taken all the steps required with the formalities prescribed by the laws and regulations in such cases made and provided; now, therefore, using the powers with which I am intrusted, and in the name of the Mexican nation, by decree of this day, I do grant to the said successors the above-mentioned tract of land, declaring the same to be their property by the present letters, in entire conformity with the tenor of the laws and in confirmation of that concession, subject to the following conditions:—

"First—That they will comply with the rules and regulations which may hereafter be made for the distribution of public lands, and that they will not, in the mean time, neither they, their grantees, nor their heirs, have the power of dividing nor

alienating that which is granted to them; neither will they have the power of laying upon the same any liens, mortgages, nor encumbrances whatever, even for pious causes, nor to make a mortmain transfer of the same.

"Second—They are hereby allowed to fence the same, without prejudice to the passages and ways across the same and other servitudes. They will have the free and exclusive use and enjoyment of the same, cultivating and using the said land as they will think best; but within one year at the latest they must build a house thereon, which shall be inhabited.

"Third—They shall apply to the competent judge for the judicial possession of the said land, in accordance with the present title, for the purpose of having the boundaries of the same marked out, which, besides the ordinary land-marks, will be defined by some fruit trees or other trees of some utility planted for the purpose.

"Fourth—The herein-mentioned tract is of three square leagues, more or less, according to the design which accompanies the expediente granted to them.

"The judge who will put them in possession shall have the said tract measured according to law, so that the boundaries may be marked out, the surplus, if any, reverting to the nation, for such uses as may be proper.

"Fifth—Should they fail to comply with the foregoing conditions, the grantees will lose their rights to the said tract of land, which will become liable to be claimed by others.

"I therefore order that these presents be, to all intents and purposes, a good and valid title to the grantees, that the same be recorded in the proper book, and that it be delivered to the parties interested for their security and for all other ends and purposes.

"Given at Monterey, this 12th day of June, 1834.

"JOSÉ FIGUEROA.

"A. V. Z., Secretary."

On the 23d of June, 1835, Joaquin I. Castro presented a petition for an augmentation of the San Pablo Ranch to the political chief, as follows:—

"MONTEREY, June 23, 1835.

"Joaquin Castro, a citizen residing within the jurisdiction of

the port of San Francisco, presents himself to you, and with due respect says:—

"That I have already solicited from your excellency the legitimate possession of the rancho of San Pablo, which we, the heirs of my deceased father, actually occupied, as I have already stated in my first petition, but through inadvertence, have neglected to ask for the extent of land included in the plan annexed thereto, and have said that we only claim the three square leagues that we formerly occupied.

"This piece of land being rather too small for the number of cattle grazing on the same, which number we are exerting ourselves to increase, I solicit of you, in the name of the other heirs, and as their attorney in fact, that said petition be understood to exclude for [from?] the three leagues which we occupy, the augmentation of the land described in the aforesaid plan.

"Wherefore, I pray your excellency to grant that which I demand, hereby protesting of my gratitude, and taking the necessary oath.

"Monterey, June 23, 1835.

"JOAQUIN ISIDRO CASTRO."

The governor made the following marginal order on this paper:—

"MONTEREY, June 26, 1835.

"Let this petition be added to the expediente upon the matter, so that the secretary may report upon the same whatever he may deem expedient for the proper conclusion thereof.

"FIGUEROA."

This order was obeyed· by the secrétary Negrete on the same day. The secretary made a further report on the 27th of June, which it is unnecessary to insert here.

On the 14th of August, 1835, Figueroa made an order that a grant issue of the whole tract, in the following words:—

"MONTEREY, August 14, 1835.

"Considering the petition at the beginning of this expediente, which was obtained on the 15th of· April, 1823, from the most excellent territorial deputation, the subsequent petition which was made on the 23d of June of the present year, praying for the amplification of a little more than a square league according to the plat marked number 2, and also such

other additional documents as were furnished in conformity of
the law and regulations in such cases made and provided: I
hereby decree Don Francisco Maria Castro, and by his demise
his heirs and successors, the lawful owner and owners of the
tract of land known under the name of Los Cuchigunes, or San
Pablo, bounded by the ranchos of San Antonio and El Pinole,
and by a portion of the port of San Francisco. I order that a
good and sufficient title be made out, that the same be regis-
tered in the proper record book, that it be delivered to the
testamentary executor and heir, Joaquin Isidro Castro, for all
necessary ends and purposes, and that the expediente thereof be
archived.

"I, Don José Figueroa, general of brigade of the Mexican
republic, commander-general, inspector, and political chief of
the territory of Upper California, so order and decree, and in
faith thereof hereunto affix my name.

"JOSÉ FIGUEROA.

"F'CO DEL CASTILLO NEGRETE, Secretary."

On the 20th of August, 1835, a grant issued in the usual
form of the whole property including the augmentation, to the
*successors* of Francisco Maria Castro. On the 22d of May,
1840, the expediente was presented to the departmental assem-
bly, and the same was approved by the assembly on the 30th
day of May, 1840.

We have thus presented the matters appearing in the
expediente very fully, in order that the history of the title in
its inception and consummation might appear herein. Mexico
achieved her independence, after a long struggle, in 1821, and
became then a republic. The plan of Iguala, adopted by the
revolutionary government of Mexico on the 24th of February,
1821, and the treaty of Cordova of the 24th of August, 1821,
between the then government of Mexico and the Spanish vice-
roy, mark the close of the struggle by Mexico for her existence
as an independent nation. By the treaty of Cordova the inde-
pendence of the country was established. (*United States* v.
*Ritchie*, 17 How. 538.) Some time in 1822, the authorities of
California recognized and gave in their adhesion to the new
order of things established in Mexico.

The first step taken by Francisco Castro for the acquisition

of title to the rancho San Pablo was by a petition to the territorial deputation, on the 15th of April, 1823. This petition was for a grant " of the possession " of three square leagues in the place called Los Cuchigunes, or San Pablo. The grant was made by the deputation and approved by the then governor, Arguello. (That Arguello was then governor of California, see the list of colonial governors in Dwinelle's Colonial History, Addenda, 115.)

It is contended that the territorial deputation never had power to grant land, and several authorities are cited to that effect. ( *United States* v. *Workman*, 1 Wall. 762; *Beard* v. *Federy*, 3 Wall. 491; *Christy* v. *Pridgeon*, 4 Wall. 203; *Hornsby* v. *United States*, 10 Wall. 231–238; *United States* v. *Vigil*, 13 Wall. 450, 451; *Ferris* v. *Coover*, 10 Cal. 589.)

But in the view we take of this case it is unnecessary to decide this question. The question we especially refer to is, whether the deputation, with the approval of the governor, had the power to grant lands prior to the enactment and promulgation of the decree of the Mexican Congress of the 18th of August, 1824, relating to colonization, and of the rules and regulations of the 21st of November, 1828, for the colonization of the territories of the republic of Mexico. (See *Ferris* v. *Coover*, 10 Cal. 634–537; Rockwell's Spanish and Mexican Law, 451, 453; 1 White's New Recopilacion, 601, for this decree and the rules and regulations.)

It may be further conceded that Francisco Castro never complied with the decree and regulations aforesaid, and never acquired any title to the San Pablo Ranch previous to his death. That the facts appearing in the expediente above set forth gave him a strong equity to such a grant, we have no doubt; but it is conceded, as contended by appellants, that prior to his death he acquired no title. It may be remarked here that Governor Figueroa, reputed by all to have been an able and learned man, well acquainted with the laws of Mexico, in his order of the 12th of June, 1834, above inserted, declares in so many words that Don Francisco Maria Castro is the lawful owner of the tract of San Pablo petitioned for. We consider this statement of Figueroa as high authority, sustaining the position that Castro was in his lifetime the owner of the tract

above mentioned; but as we have said above, in the view we take of the case, it is unnecessary to pass on it. Prior to his demise in November, 1831, he made and executed a will, the clauses of which, so far as pertinent, have been stated above. We have seen that he demised one half of this rancho to his wife, and made his son his first executor.

In this condition of things, his son, Joaquin, the first executor, presents to the then governor (Figueroa), on the 26th of May, 1834, a petition for the rancho. In this petition he states " that, in consequence of the death of his father, who has instituted him heir of a portion of his property and guardian of that of his brothers, as will appear by his testament, a copy of which is registered in this capital," and *in fulfillment of the obligations* resulting from the trust which he has accepted, he solicits of his excellency the lawful ownership of a tract of land called San Pablo, a plan of which was annexed, with a copy of the first petition for the said tract, presented by his father, dated the 15th of April, 1823, and also a copy of the gubernatorial decree of the same date. He further states that the petition and decree having remained without effect, he thereby renews a demand for this piece of land, with the documents necessary for the security of the rural property thereon situated, consisting of three thousand head of cattle, nine hundred horses, and six hundred sheep.

The documents referred to in this petition were produced before the governor and appear in the expediente (they are set forth above); and Governor Figueroa, having taken into consideration the petition and the papers presented, on the 12th of June, 1834, orders a grant to be issued for the land, and on the same day a grant was issued.

The order or decree that a grant issue declares " Don Francisco Maria Castro, the lawful owner, and by his death his successors," of the tract of land known under the name of San Pablo, and directs that a title be delivered in conformity thereto ( " with the above " ), that it be registered in the proper book, and handed over to the testamentary executor and *heredero* (heir), Don Joaquin Isidro Castro, for the ends required.

The word translated " testamentary executor " in the above is *albacea,* and it is said to be incorrectly rendered. Escriche defines *albacea* thus : " He who is charged with fulfilling and

executing that which is directed by the testator in his testament or other last disposition": see word *albacea* in Escriche's Diccionario, etc. In the dictionary of the Spanish academy it is defined *testamenti exsequendi curator.* In Seoane's, Newman & Barretti's Dictionary the definition is "testamentary executor." We think the word is correctly translated. The title or grant was accordingly issued to the successors of Don Francisco Maria Castro. The word translated "successors" in the above document is *herederos.*

The important question arises here and is to be determined, who are the *herederos* referred to by Governor Figueroa in the described grant above stated, and to what persons or class of persons did he intend to make the grant or title? The grant is made to these persons, whoever they are. It is contended on behalf of the appellants that the *herederos* referred to are the brothers and sisters. On the other hand, the contention is that the *herederos* referred to are the persons to whom the rancho was devised by the will of Francisco Maria Castro.

Of this word *heredero*, Escriche says that "anciently the proprietor of any inheritance was so called; and it still preserves this signification in some parts." He proceeds further to state that this signification comes to us from the Roman law; that Justinian in his Institutes informs us that the expression *acto de heredero* is the same as the act of the proprietor, giving as a reason that the ancients called heirs, owners, or masters: *Veteres enim hœredes pro dominis appellabant.* Upon which text Cuyas observes that *hœres* comes from *herus*—*lord* or owner. Further as to this word, he says he is the person who by a testamentary disposition or by law succeeds to the rights which a deceased person held at the time of his death; that the word *heredero* is, according to some, derived from the Latin *herus*, signifying lord or owner; according to others from the word *hœres*, which signifies joined or fastened to another, because the heir (*heredero*) is next to the person from whom he inherits, as his relation or intimate friend. Thus it is in Latin, some write *heres* and others *hœres*; that the heir represents the person of the deceased, and they are considered as the same person. That the quality of heir has no other origin than the will of man or the disposition of the law; and hence comes the general division of heirs

into *testamentary or intestated* and *heirs by law or from intestacy.*
The testamentary heirs are divided into *forced or necessary* and
*voluntary or strangers.* The heirs by the law or from intestacy
can be subdivided into heirs by *relationship,* heirs by *matrimony,*
or *anomalous.* (See word *heredero,* Escriche's Dicc., edition
above stated.)

The heir can be instituted by will if designated in the will by
apt words, so that it can be perceived who is meant. (See 2
Moreau and Carleton's Partidas, Law 6, on pp. 983, 984;
Schmidt's Law of Spain and Mexico, arts. 1048–1051; and sev-
eral persons may be instituted *joint heirs,* see work last cited,
art. 1050.) The language of the will of Francisco Maria Castro
was sufficient in a legal and valid will to institute an heir.

The question then recurs, To whom did Governor Figueroa
grant the rancho San Pablo? In our judgment, the governor
intended to make the grant to them to whom the property was
given by the will of Francisco M. Castro, and in the propor-
tions in which it was so given. The language of the documents
signed by him indicates this clearly. To show that such was
his intent, we will review the papers briefly.

The petition of the testamentary executor, as Joaquin I. Cas-
tro is styled in the decree of the 12th of June, 1834, bearing
date the 26th of May, 1834, refers to the last will of his father
by which he was instituted heir, and states that a copy of it is
registered in the capital. He states that he desires the grant
that he may fulfill the obligations resulting from the trust which
he has accepted and for the due execution of the same. He
refers to the application of his father and the decree upon it,
and in accordance with the order of the governor produces the
documents relating to the application made by his father prior
to his death. It is a fair construction of this petition that it
referred to the obligations resulting from the provisions of the
will, by which one half of the rancho was devised to his mother,
and of which will he was the executor. He desires the grant
for the due execution of the trusts — referring to the trusts
under the will.

But whether this be the proper construction of the petition
of Joaquin or not, it is evident that the governor put this con-
struction upon it. He declares that the father was the lawful

owner, and by his death his successors (*herederos*) arc lawful owners of the land, and directs that a title in conformity with this view be delivered and handed over to the *testamentary executor,* Don Joaquin Isidro Castro, for the ends required. The grant is then issued in conformity with this decree to the successors (*herederos*). No doubt the governor examined and considered the will, which was registered in Monterey, the capital, where he was when he made the grant to the *herederos* who were to succeed under the will. These persons were the successors referred to by the governor in his decree and grant or title. The title or grant was directed to be delivered to the testamentary executor, "for the ends required," that he might execute and fulfill the trusts of the will, and carry out its directions. The governor seemed to have recognized the will as a valid instrument. At any rate, he made the grant to the parties entitled under the will and according to its provisions, which he had power to do under the decree of 1824, and the regulations of 1828.

The same reasoning applies to and is true of the augmentation petitioned for by Joaquin I. Castro on the 23d of June, 1835, and granted on the 20th of August of the same year. It appears from the bill of exceptions that after the death of Gabriela Berreyessa, widow of Francisco Maria Castro, which occurred in December, 1851, the claim for the rancho San Pablo was presented to the board of land commissioners to ascertain and settle private land claims in the State of California, under the Act of Congress of March 3, 1851. When the claim was presented to the board, a petition was presented along with it signed by Eugene Musson and Saunders, Hepburn & Bagley for the petitioner. The petitioner was Joaquin I. Castro, who styles himself in it, "administrator with the will annexed of the estate of Francisco Maria Castro, deceased." The petition was filed October 9, 1852, and is in the following words:—

"RANCHO SAN PABLO, CONTRA COSTA COUNTY.

"To the United States land commissioners to ascertain and settle the private land claims in the State of California.

"Joaquin Isidro Castro, administrator with the will annexed of the estate of Francisco Maria Castro, deceased, respectfully represents:—

"That on or about the 15th of April, 1823, said Francisco petitioned the governor of California—at that time Don Luis Arguello—for a tract of land situate in said territory of California, containing three square leagues, and within the boundaries following, viz.: Situate on the coast of the mission of San José, parallel with the port of San Francisco, adjoining the property of the Sergeant Luis Peralta, up to the line of the ridge of mountains to the place called Los Cuchigunes, at the margin of a deep creek that there springs, at something like five hundred varas. The house is built distant three leagues from the place of residence of Peralta, known as the hill of San Antonio, and up to the ravine of El Pinole at the north.

"That afterwards, on or about the day or year aforesaid, said Francisco received from the said governor and territorial deputation of said territory, a grant of said land, and shortly thereafter went into possession thereof, and occupied and improved the same continuously thereafter until his death, in the year A. D. 1831.

"That afterwards, on or about the 12th day of June, 1834, upon the petitions of said Francisco before his death, and afterwards of this petitioner for himself and others, the claimants under said title—Don José Figueroa, governor at that time of said territory—by order of that date recognizing the grant and title aforesaid, ordered a formal title to said land to be made out for the benefit of said Francisco and his successors in interest, and to be delivered to petitioner as the testamentary executor of said Francisco, which said formal title was made out and delivered as aforesaid, on the day and year last aforesaid.

"That afterwards, to wit, on the 14th and 20th of August, 1835, said Figueroa, governor as aforesaid, upon petition made according to law, granted as aforesaid, all the surplus land of San Pablo, according to a plan thereof annexed to the petitions last aforesaid, copies and translations of all which said documents, petitions, titles, grants, and plats, hereinbefore referred to, are herewith filed.

"That said grants were afterwards confirmed by the departmental assembly of California.

LXIV. CAL.—36.

" That said Francisco and his successors in interest have duly complied with the terms and conditions of said grants, and of the laws and regulations of Mexico relative thereto.

" Petitioner further represents that said Francisco was married to Gabriela Berreyessa, and died in the year 1831, leaving surviving him his wife and eleven children. The issue of said marriage being Alvina, Maria de Jesus, Maria, Francisca, Martina, Antonio, Juan José, Gabriel, Victor, Jesus Maria, and this petitioner. That said Francisco left a will signed, attested, and published according to law, whereby he devised and bequeathed to his wife one undivided half of his said land and other property, the other half to his said children, to be equally divided between them. That said Martina Castro has intermarried with Juan B. Alvarado; that said Francisca married Joaquin Moraga, both of whom died, leaving issue of said marriage five children, viz.: Francisco M., José, Maria de los Angeles, Luisa M. de Briones, and Guadalupe, who married Vicente Martinez and died, leaving surviving her two children, (issue of said marriage) now living, viz.: Francisca and Merced. That since the death of Francisco first aforesaid, his said children, Alvina, Maria de Jesus, and Maria have died without issue, and their share of said land descended to their said mother, who thereupon became the absolute owner of fourteen twenty-seconds (14–22) of all said land.

" That afterwards, on the 4th day of August, 1851, said Gabriela Berreyessa de Castro, by deed executed the day and year aforesaid, in consideration of natural love and affection for her said daughter, Martina Castro de Alvarado, gave and conveyed to said Martina all the said interest (14–22) of her, the said Gabriela, to and in said land. That said Martina thereupon became entitled to fifteen twenty-seconds (15–22) of all the land aforesaid.

" Petitioner represents that he was named executor in the said last will of said Francisco, but that he declined to act as such, and afterwards, on the —— day of —— 1852, he qualified in the Probate Court of the county wherein said land is situated, as administrator with the will annexed, and that the period of administration is not yet expired. Wherefore, petitioner prays

that said land may be confirmed as granted to the parties entitled thereto as aforesaid.

"EUGENE MUSSON, SAUNDERS, HEPBURN & BAGLEY,
                                                for Petitioner.
"[Indorsed.]   Filed October 9, 1852.
                    "GEO. FISHER, Secretary."

A translation of the will and codicil of Francisco Maria Castro was presented along with it.

It will be observed that in this petition it is stated that a grant to Francisco Maria was made of a tract of land of three leagues, on his petition, by the governor, Don Luis Arguello, and the territorial deputation, on or about the 15th of April, 1823, and that shortly thereafter the grantee went into possession of the land granted, and occupied and improved the same until his death, in 1831. The petitions for said grants by Figueroa are also stated, which grants were confirmed by the departmental assembly. It is further stated that Francisco Maria was married to Gabriela Berreyessa, and died in 1831, leaving surviving him his wife and eleven children, the issue of this marriage, viz.: Alvina, Maria de Jesus, Maria, Francisca, Martina, Antonio, Juan José, Gabriel, Victor, Jesus Maria, and the petitioner; that Francisco Maria left a will signed, attested, and published according to law, whereby he devised to his wife one undivided half of his said land and other property, and the other half of his said property to his children, to be equally divided between them. That said Martina Castro has intermarried with Juan B. Alvarado; that said Francisca married Joaquin Moraga, both of whom died, leaving issue of said marriage five children (naming them); that one of these children last named, Guadalupe, married Vicente Martinez, and died, leaving surviving her two children, issue of said marriage, living when the petition was filed, named Francisco and Merced. That since the death of Francisca Maria Castro, his said children, Alvina, Maria de Jesus, and Maria have died without issue, and their share of said land descended to their mother, Gabriela, who thereupon became the absolute owner of fourteen twenty-seconds of all said land; that on the 4th day of August, 1851, said Gabriela Berreyessa, by deed executed on that day, gave and conveyed to her said daughter, Martina Castro de Alvarado, all

her interest in said land; that said Martina thereupon became entitled to fifteen twenty-seconds of all of the land aforesaid; that he was named executor in the said last will of Francisco Maria, but declined to act as such, and afterwards qualified as administrator, and that the period of administration has not yet expired. The petition prays for a confirmation of said land, "as granted to the parties entitled thereto as aforesaid."

On the 17th of April, 1855, the claim of petitioner was confirmed and adjudged to be valid. It also appears that such further proceedings were had that the claim was finally confirmed by the proper United States District Court, that the land was afterwards surveyed, and the final survey was approved on the 17th of August, 1864, by Honorable Ogden Hoffman, United States district judge. The final survey contained seventeen thousand nine hundred and thirty-eight and fifty-eight hundredths acres, a patent for which was afterwards, on the 31st of January, 1873, executed and issued by the United States to Joaquin I. Castro and his heirs and assigns, with the stipulation that neither the confirmation nor patent shall affect the interests of third parties.

In relation to this patent it may be here said, that it was issued after the suit was commenced, and was offered in evidence by the plaintiff after the argument of the cause had commenced. To its admission in evidence Mr. Brooks, on behalf of the defendants for whom he appeared, objected, "because the said patent issued after the commencement of this suit, and it was not alleged in any supplemental complaint or otherwise." The court overruled the objection, and an exception was reserved on behalf of the defendants who objected. We cannot see that any injury was done by this ruling to any party; and therefore, admitting that it was an error, we would not reverse for such error. It is well settled that error without injury furnishes no ground for reversal.

It is argued that the will of Francisco Maria is invalid, as it was not executed according to the law as it stood when it was made. In the view we have taken above, that the grants by Figueroa were made to those who are described in the will as the devisees or heirs of the land, and in the proportion as devised by the will, it is unnecessary to pass on the validity of the will. We

will say, however, that this will was before the Supreme Court of this State in 1856, in a case decided at the April term of that year, in which this point was passed on. (*Castro* v. *Castro*, 6 Cal. 158.) It was held in that case that the will was properly executed, that a sufficient number of witnesses attested it, and that it was in other respects executed according to the law in force when it was made and published. The ruling in this case was approved in *Tevis* v. *Pitcher*, 10 Cal. 477. There was proof in this case of the custom by which a will attested by three witnesses was well attested, as in *Tevis* v. *Pitcher*, and in *Castro* v. *Castro*. (See also *Panaud* v. *Jones*, 1 Cal. 488 ; *Adams* v. *Norris*, 23 How. 363.) Admitting, as argued, that the Probate Court had no jurisdiction of the probate of the will in *Castro* v. *Castro*, and that therefore the decision in the case in 6 Cal. is not binding for want of jurisdiction, still we are of opinion that the law was properly declared in the case, and that the rule therein laid down was approved in *Tevis* v. *Pitcher*. Therefore, we do not think it necessary to review the ruling in *Castro* v. *Castro*, considering this point as settled by the judgments of this court. If we were to decide this point, we would feel bound to hold the will of Castro to be a valid will, properly executed and attested.

It is further contended that though the will was executed according to law, still that it cannot be held to have the effect to pass to Gabriela Berreyessa, the widow, one half of the San Pablo Ranch, for the reason that the testator had not, under the Mexican law, the power to make such devise. This point is elaborated with much learning and ability by the learned counsel (B. S. Brooks, Esq.) for the defendants, and there is placed before us an extended discussion of the power of the father over his real property, and the limitations and restrictions thereupon. We have read the brief of counsel with great interest and care. But as stated above, we are of opinion that the devisees under the will were the grantees of Figueroa in both of the grants or titles made and issued by his order, and therefore it is unnecessary to enter upon an examination of the power of Francisco Maria Castro to devise his realty to persons other than his children.

Subsequent to the death of their father, Francisco Maria

Castro, and before the death of their mother, Gabriela Berreyessa, three of the children of this marriage, viz., Alvino, Maria de Jesus, and Maria Gregoria, died intestate and without leaving any descendants; the latter, Maria Gregoria, married José Ramon Estrada, who died before his wife. The question arises to whom these interests in the ranch passed. It is contended on behalf of some of the defendants that these interests passed by law to their surviving brothers and sisters, and on behalf of the plaintiff that these interests passed to their surviving mother, Gabriela.

On an examination of the Mexican law on the subject, we are of opinion that these interests were vested in the mother. Escriche, in treating of the succession to the estate of intestates, states as the first class, his or her legitimate descendants. (See Escriche's Dicc. de Legislacion y Jurisprudencia, Paris ed. of 1852, under the title "Heredero Legitimo ó ab intestato"; see also Madrid edition for 1873, under same title, and Don Juan Sala's "Ilustracion del Deercho Real," lib. 2, title 8, § 2; Schmidt's Law of Spain and Mexico, §§ 1232–1234.)

The second class or order of succession is stated by Escriche to be the ascendants, the nearest ascendant always excluding the more remote. The law is thus given by this learned author and jurist: "There being no descendants to inherit as set forth in the explanation of the first order of succession, there enter upon the succession of the deceased intestate his legitimate ascendants, without distinction of sex, with the absolute exclusion of collaterals, though they are brothers. (Citing Law 2, title 2, lib. 4, del Fuero Juzgo; Law 1, title 6, lib. 3, del Fuero Real; Law 4, title 13, part 6; and Laws 6 and 7 de Toro; 1 and 2, title 20, lib. 10, Nov. Rec.) Further, that the nearest ascendant excludes always the more remote, because among ascendants there is no succession by representation, as among decendants, but by proximity of relationship. So that if the deceased leaves father and mother, both inherit in equal proportions; but if there is father only, or mother only, the survivor inherits the whole property, and the grandfather of the deceased takes nothing. In the same manner, if there is no father or mother, and there is a grandfather of one and a great-grandfather of the other, the whole inheritance will be that of

the grandfather, to the absolute exclusion of the great-grand-father." (Citing Law 4, title 13, part 6; see Escriche's Dicc. de Leg. y Jurisp. above cited, under same title as above given; Sala's Ilustracion del Derecho Real, lib. 11, title 8, § 6; Schmidt's Law of Spain and Mexico, §§ 1235–1237; Escriche's Dicc. title Representacion.)

It is contended further, that these interests passed to the other children of Francisco Maria and his wife Gabriela, by the right of *acrecencia* or *acrecimiento* — accretion. This right is thus defined by Escriche: The right of accretion is the right to unite or aggregate with his portion the portion of him who refuses it and cannot acquire it, or the right which the co-heirs or co-legatees have over those portions which remain vacant by reason of renunciation, or by reason that some of them have not the capacity to take. The right of accretion takes place among the legitimate heirs, that is, among the heirs called to the succession by the law by reason of relationship, in the collateral as in the direct line; so that the portion which remains vacant is added to the mass of the inherited property, and is divided with it; and further, it is understood that there is a failure of one of the co-heirs or co-legatees, if he is not living at the time that the will is made, if he rejects the inheritance or legacy, if he dies before the testator, if he omits to comply with the condition, or becomes incapable in any other way. In case he survived the testator a single moment, he transmits his part of the inheritance or legacy to his heirs, when acceptance is not necessary for its transmission, according to what is said in the articles "*Aceptacion de herencia y de legado,*" and by consequence, there is then no accretion to the other co-heirs or co-legatees. In this case the mother, as we have seen, was the heir, and took the estate.

We see nothing in the contention put forth on behalf of some of the defendants that the interests of the above-mentioned children constitute *bienes reservables*, in which the widowed mother only had a life estate. The law on this subject only applied where the widow married a second time. (See Escriche's Dicc. de Leg. y Jurisp. art. "Bienes Reservables ó Reservaciones.") It does not appear that Doña Gabriela ever married a second time.

According to the above authorities, and there are none of greater weight, it is clear that Doña Gabriela Berreyessa, the surviving mother, inherited the interests of the above-mentioned children, who died without issue and intestate. Some question is made as to the quantity of estate which passed to the widow under the provisions of the will, which we have held was granted to her by Governor Figueroa. The provisions of the will have already been quoted, and we are of opinion that it passed the fee. That was the intention of the testator, as appears clearly from the language of the will. (See 2 Moreau & Carlton's Partidas, Law 6, tit. 3, part 9, p. 983.) We speak of the will in these terms as a valid will, because, in our judgment, Governor Figueroa so regarded it in making the grants to the heirs instituted by that document. As eleven children survived Francisco Maria Castro, to whom were granted one half the estate in equal portions, and to the mother the other half, Gabriela Berreyessa, the mother, became entitled to eleven twenty-seconds of the rancho San Pablo under the grant, and as she inherited three shares, or three twenty-seconds, from her children above named, she thus became the owner of fourteen twenty-seconds.

On or about the 4th day of August, 1851, Gabriela Berreyessa de Castro executed to her daughter, Martina Castro de Alvarado, a deed of gift by which, in consideration of love and affection, she conveyed to her and her heirs forever all her undivided interest in the rancho San Pablo. This deed was recorded in the office of the county recorder of Contra Costa County on the 9th of September, 1851.

This conveyance is assailed as null and void because of the mental incapacity of the grantor. The court below found that the grantor, Gabriela Berreyessa, was, on the 4th and 12th of August, 1851 (at one or the other of those dates the evidence shows that this deed was executed), and from thence to the time of her death, of sound mind, capable of transacting business, and under no mental disability whatsoever, and that the deed was a valid instrument. It is now contended that this finding is not sustained by the evidence. It is sufficient to say that as to the capacity of the grantor to make such a deed, the evidence was conflicting, and under the rule of this court, settled by a

great number of cases, we are not at liberty to disturb the find-
ing of the court a qua, that she was competent to execute said
instrument.   Under this deed Martina Castro de Alvarado
became the owner of fourteen twenty-seconds of the rancho San
Pablo, and already owning one twenty-second, she then was the
owner of an undivided interest of fifteen twenty-seconds of the
land to be divided, which she held in common with the owners of
the other interests in the land, amounting to seven twenty-seconds.

In 1856 steps were taken to partition the ranch between the
various parties claiming interests therein.   The agreement for
or deed of partition appears in the bill of exceptions.   It is a
long instrument, formally drawn up, between parties of nine
parts.   The parties of the first part are John H. Saunders,
H. P. Hepburn, and Eugene Musson.   The parties of the other
parts agree to pay to the parties of the first part the sum of
two thousand dollars, costs of litigation, assessed to them by
the agreement in the case of *Castro et al.* v. *Castro et al.*, as a
condition precedent to the operation of the agreement as a con-
veyance, as set forth therein.   By it, three commissioners were
named and appointed, viz.: James Alexander Forbes, John B.
R. Cooper, and Nicholas Gray, to make partition of the ranch
in the manner mentioned in it, and to that end to make the
necessary survey, map, and report, which were to be filed for
record among the land records of the county of Contra Costa,
"with this deed of partition and release, the whole to take
effect when so filed and recorded, and not before."

Other provisions were made in this instrument of partition,
as follows:—

By the third article it was provided that the commissioners
above named should first separate from the rancho a tract of
fifty acres, said fifty acres to be chosen by Doña Martina Castro
de Alvarado, so as to include therein the house where she and
her husband then lived, and the orchard attached thereto, and
all their title and interest in this fifty acres, the parties of the
first, third, fourth, fifth, sixth, seventh, eighth, and ninth parts,
and Goodale and Benson, also parties of the second part, there-
by convey and release to said Martina and her heirs, the same
to take effect as soon as the said report and map and this deed
shall be filed for record as above stated.

By the fourth article of this deed the commissioners were then to separate from the remainder of the ranch a tenth thereof in value, which tenth they should divide into three equal parts, one of which parts they should assign to Eugene Musson, one to John H. Saunders, and the remaining one to H. P. Hepburn, all their interest and title in which three parts the parties of the other parts thereby convey and release to the said Musson, Saunders, and Hepburn, respectively, and their heirs forever; the same to take effect at the same time as is provided with regard to the fifty-acre tract. In consideration whereof Musson, Saunders, and Hepburn convey and release to all 'the other parties and their heirs all their right, title, and interest in the rest of the ranch, and particularly Musson releases to the said Martina and her husband, and to Joaquin I. Castro, all his right and claim against them or either of them, by reason of contracts touching the ranch, heretofore entered into by them with him.

It is provided by the sixth article that the commissioners shall then separate from said ranch an eighth thereof in value, of which two thousand acres are to be taken from that part of the ranch lying north of the Arroyo Grande, the particular boundaries of which are given; this tract is to be chosen by Doña Martina Castro de Alvarado, provided her choice shall not exceed one eighth in value of the remainder of the ranch; and the tenth of Saunders, Hepburn, and Musson shall so be allotted as not to interfere with this allotment of two thousand acres. All their interest in this last allotment the other parties release and convey to the said Martina and her husband, the same to take effect at the same time as the other allotments above mentioned. In consideration of the foregoing, Martina and her husband release and convey to the other parties, except Goodale and Benson, all their title in the remainder of the ranch, except the fifty acres above mentioned, to be held as hereinafter specified; and in further consideration of the foregoing, Goodale and Benson, who are parties of the second part, and mortgage creditors of Martina and her husband, who are also parties of the second part, release in favor of the parties of the other parts, the lien of their mortgage against the said Martina and her husband from such parts of the ranch as shall

be adjudicated to the other parties; and in consideration of this release it is agreed between Goodale and Benson, and Martina and her husband, that the lien of the mortgage shall attach to and bind the eighth, so as aforesaid adjudicated, to Martina.

The commissioners were then to divide the remainder of the ranch into seven equal parts in value, one part to be allotted to each of the parties of the third, fourth, fifth, sixth, seventh, eighth, and ninth parts. The parties of the several parts then convey and release to each other respectively the parts so allotted to each party, the same to take effect on the part so released subject to the same rights, liens, and priorities between themselves as existed on the undivided interests of the said parties of the several parts, at the same time with the others above mentioned. In consideration of the foregoing, the parties of the third, fourth, fifth, sixth, seventh, eighth, and ninth parts, respectively, release and convey to the parties thereto, except Goodale and Benson, all their right in the remainder of the ranch; the part of the remainder which shall be allotted to the parties of the fourth part shall be so chosen as to include eight hundred acres of the land now in the possession of Juan José Castro or his tenants.

The seventh article provides for allotments to be made so as to include lands conveyed by certain deeds in the parts allotted to certain of the parties. The eighth article provides that the costs of partition, survey, map, report, etc., are to be paid by certain of the parties therein named. By article 10 it is provided that in consideration of the release before mentioned of Martina and her husband, the parties to the instrument release and convey to Joaquin I. Castro, in trust for his wife and their children, twenty-five acres of the ranch; the same number of acres to Juan José Castro in trust for his wife and their children. Like conveyances in trust of the same quantity of land are made to Gabriel Castro, Antonio Castro, to Victor Castro, to Jesus Maria Castro. In the same article it is provided that these tracts of twenty-five acres shall be so selected as to include the houses in which the trustees themselves respectively lived, and the further provision is made as to what parts these tracts are to be charged respectively; but by article 11, on making these allotments, the houses of Joaquin, Juan José, Antonio, Gabriel,

and Victor are not to be charged to the shares derived from them.

The twelfth article then provides when and under what circumstances the deed, report, and map are to be filed for record by Forbes, one of the commissioners, and that the partition shall be executed and closed within three months from the time this agreement shall be placed in their hands for the purpose of making the partition.

This instrument purports to have been executed and acknowledged by nearly all of the parties to it. The survey, map, and report were made, and the deed, etc., were filed and recorded on the 28th of August, 1857.

The validity of this partition is called in question by the plaintiff and other parties to the action. In relation to it the court finds the following facts, which in our judgment are sustained by the evidence:—

" That said commissioners attempted to make a partition and allotment under said agreement of said land and other lands, and filed a report of their proceedings with the recorder of Contra Costa County, August 28, 1857, and the same was recorded in volume 6 of deeds, pages 1 to 18 inclusive.

" That said agreement was not executed by all the parties interested in the fee of said rancho as tenants in common; that it was not executed by Joseph Emeric, James T. Dean, and others, tenants in common, and owners of divers interests in said rancho; that a large number of the owners and tenants in common in said rancho refused to and did not sign or execute said agreement for partition.

" That said agreement purported to be executed on behalf of certain infants, owners and tenants in common, of an undivided interest in said rancho, to wit, Francisca M. de Soto and Merced M. de Welch, by one Vicente Martinez, as their attorney in fact, who had no power, authority, or right as such to execute for them said agreement, and the same was not executed by said infants, or either of them; and said infants were then married women, and their husbands, then living, did not join in the execution of said agreement.

" That said commissioners included in their survey, attempted partition, and report of the lands of said rancho twenty-seven

thousand four hundred and seventy-one acres of high lands and two thousand four hundred and seventy acres of marsh lands, aggregating twenty-nine thousand nine hundred and forty-one acres, being an excess of, say, twelve thousand and three acres more than was included in the final survey approved by said United States District and Circuit Courts as aforesaid.

"That said commissioners made an attempted partition, recorded as aforesaid, among said tenants in common, of the high lands above mentioned, and did not undertake to partition the marsh or marshy lands mentioned in their report and survey, and that said attempted partition included, say, nine thousand five hundred and thirty-three acres more than ever belonged to the rancho, some of which was part of the adjoining San Antonio or Peralta Ranch, and allotted the same as a part of said rancho San Pablo.

"That said nine thousand five hundred and thirty-three acres were wholly outside the bounds of said rancho, as confirmed and patented as aforesaid, and said attempted partition did not allot to the parties to said agreement their equal share of the lands within the bounds of the rancho, and that said allotment of said excess was so made as to destroy the equality of said partition.

"That said commissioners reported, among other things, that as to the surplus marshy lands comprised in their survey, and by them supposed to belong to the said tract of the rancho de San Pablo, said commissioners had called the same to the attention of the parties interested, and that said parties had decided that the surplus of marshy lands should remain for the present undivided; that the division thereof has never been completed; that the said surplus marshy lands comprised in said survey, and referred to by said commissioners, never have been divided; that the decision of some of the parties interested therein to allow such lands to remain undivided was not the decision of all, and did not comport with the terms of the submission to the said commissioners."

The court below, on the facts found by it, held the agreement and deed of partition dated July 14, 1856, void and ineffective. The above-mentioned deed and agreement have been twice before the Supreme Court of this State: first in January, 1859, in the

case of *Tewksbury* v. *Provizzo*, 12 Cal. 21; and the second time in October, 1862, in *Tewksbury* v. *O'Connell*, 21 Cal. 61.

Both of these actions were ejectment. In the case first cited the plaintiff deraigned title from a party to this deed, who executed it. The defendant's predecessor in interest was also a party to the deed. It is stated in the opinion of the court, that the controversy in the cause turns upon two questions: "The first is, what is the effect of this deed of partition, supposing. it to have been regularly carried into execution — that is, is it an estoppel? The second is, has there been such a departure from its terms as to invalidate it, or the proceeding under it?" (12 Cal. 23.)

The decision appears to have been made on the deed alone, and it rested the estoppel of the defendant on that instrument without other proof. There does not seem to have been any proof that the defendant or his grantor or predecessor ever acted under the deed, that either of them ever took possession under it.

The court states the contents of the agreement and deed of partition, and then proceeds to a discussion of the question of estoppel by the deed. The court in this discussion remarks as follows: "It has thus been seen [referring to a statement of the contents of the deed] that this instrument is what on its face it purports to be, to wit, a deed of conveyance, release, and partition. It is true that the release is not to take effect except by force of a future event, to wit, the making of the partition and the recording of it. But we are unable to perceive why a deed like this may not be effectual on a future event, so at least as to estop a party on the happening of such event to controvert it. It may be conceded that this event was a condition precedent to the vesting of the estate provided for by the deed; as was the payment of the purchase money in the case of *Brannan* v. *Mesick*, 10 Cal. 95. But, within the principle of that case, it would seem that on the happening of the event, the deed became effectual as a partition and release. In this respect it is not material whether the several parties were owners or had merely liens, as the deed taking effect on the happening of the event, and purporting to release and convey all the title of the grantor, the grantor would be estopped to deny that he had title at the time. But apart from this we apprehend that when parties go into a

partition of property upon certain terms and conditions, each to receive a several portion of a common estate, the instrument of partition, founded upon mutual releases, itself is such affirmation of interest and title on the part of each as to estop him to deny that he did have interest and ownership in the premises; and the release and conveyance of his interest to his parceners is evidence of title in his grantees which he cannot dispute. He takes, by virtue of the deed, all *their* interest, and cannot be allowed to say that he holds possession of what he conveyed and released, by a title paramount to that which he conveyed. In this case there was no pretense that the possession of the defendant previous to the deed was by any different title than that which he conveyed and released; indeed, such possession was in entire consistency with such interest, and, it is fairly presumable, was held by him as a tenant in common under the title which he showed on the trial." (12 Cal. 24, 25.)

The court, it will be perceived, held that the defendant was estopped to deny plaintiff's title to the land sued for set off under the deed of partition, both plaintiff and defendant claiming under parties to the deed.

It does not appear from the report of the case that the fact that the deed was not signed by all the parties to it was brought to the notice of the court, or the further fact that the partition was made of land not included within the ranch. These facts are not adverted to by the court. If the attention of the court was called to them, it seems to us that they would certainly have been noticed and passed on. So in construing this opinion we must take it as a decision not affecting the matters just stated.

There was a question made as to the allotment of Guttierrez. That is disposed of on the ground that the allotment was made by virtue of a contract, authorizing such allotment, to which contract the parties under whom the defendant claimed were parties, of all of which the defendant was a purchaser with notice. Defendant was therefore held bound by this allotment.

The next point considered and passed on by the court was the objection that the partition was not binding, because the entire tract was not divided, but some marsh land was omitted from the division and allotment. We give the remarks of the

court on this point in its own words: "The report of the commissioners on this subject is as follows: 'As to the surplus of marsh land comprised in this survey, and belonging to the said tract of the rancho de San Pablo, we have called the same to the attention of the parties interested, and they have decided that the said surplus of the said marshy lands should remain for the present undivided.' No proof was offered that this land was of any value; or that the division made was affected in any manner by the failure to divide or allot it; or that the allotments made would in any degree have been affected by the allotment of this; or that any injury resulted to any one interested in consequence of this omission. Moreover, no objection seems to have been made to this allotment and partition on this account. Nor was any exception taken to the admission of this report and these proceedings of the commissioners as evidence, for the specific reason that the statement made by them was inadmissible proof of the facts of agreement and consent stated in the report. In no way, for so long a time after the report was filed and recorded, was there any protest or objection on this score until this defense, though by the terms of the deed, the report and partition was to vest title. Important rights have been vested under these proceedings, which a court will not disturb without great reluctance. There is, besides all this, some proof that the defendant, after the report, at least impliedly conceded that, so far as Saunders, one of these parties, was concerned, the title vested; for the witness, Morgan, says he, defendant, recommended a party to purchase from Saunders. Under all these circumstances, we think we shall not be warranted in holding that these proceedings are void because of this omission."

It cannot be held that the court would have ruled as they did in this case if the facts mentioned above had been brought to their notice. The deed is treated throughout the opinion as having been executed by all the parties owning interests in the tract of land described. The court in stating the case says: "The plaintiff, on the trial, offered and read in evidence a paper purporting to be a deed of partition of the rancho San Pablo, the parties, who were very numerous, claiming to be the owners and interested in that rancho; and the deed recites that 'it was

made in order to settle all disputes touching said rancho and make amicable partition thereof.'"

Further, the court said: "The plaintiff claims the premises through a deed from one of the original owners, whose share, as allotted by the commissioners, he represents." "The defendant's predecessor in interest was a party to this deed of partition." (12 Cal. 22, 23.) The court then proceeds to consider the question of estoppel, and to decide it on the contents of the deed alone.

In the case cited from 21 Cal. 60, *Tewksbury* v. *O'Connell*, other points in relation to this deed were presented, considered, and decided. We proceed to examine the case just referred to, to ascertain what was adjudged therein. The plaintiff brought ejectment to recover certain premises which were a part of the San Pablo Rancho. The defendant claimed to be the owner of an undivided one twenty-fourth part of the rancho. He set up this title and denied the alleged right of plaintiff, and for a further answer set up as an equitable defense, that the plaintiff claims title in severalty to the demanded premises under and by virtue of a certain agreement for a partition of the same rancho, which agreement, and the proceedings taken under it, the defendant charges are void, and asks to have them so adjudged. The plaintiff filed a replication, in which he admitted that he claimed title in severalty under this agreement, and asserts the validity of the agreement and the proceedings under it. The issue arising out of the equitable defense was tried separately, and a judgment was rendered that the agreement was void against the defendant and his grantors, and the further prosecution of the action by plaintiff was enjoined. An appeal was taken by plaintiff from this judgment and an order denying his motion for a new trial. The grantors of both plaintiff and defendant were parties to and executed this agreement, which was the agreement and deed above stated, of date 14th July, 1856.

On the trial, the plaintiff offered this agreement in evidence. Its admissibility was objected to by defendant, on the ground that it had not been executed by John T. Dean, Francisco Martinez de Soto, Merced Martinez de Welch, and José Ramon de Castro, who were named as parties to it, nor by Joseph Emeric, not named as a party, but who was admitted by the

pleadings to be interested in the rancho. The objection was sustained, and plaintiff excepted. The court affirmed the judgment, and we suppose the order denying a new trial.

The court states the point to be decided thus: "No question is made but that this agreement is valid against the defendant, if it was valid against his grantors. The first point, therefore, which arises in this case, is whether this agreement is valid and binding against those who executed it, although it has not been executed by others who are named in it as contracting parties, and who are declared in it to have interests in the land proposed to be partitioned." (21 Cal. 67.)

The contents of the agreement are briefly stated by the court, and it then proceeds to dispose of the point as follows: —

"The plaintiff claims that upon such allotment being made, the agreement took effect as a release and conveyance by those who executed it to the other parties, of all their title and interest in the parts allotted severally to those other parties; and thus that the grantors of the defendant have conveyed to the grantors of the plaintiff all their title to that portion of the rancho allotted to the plaintiff's grantors, and which embrace the demanded premises. If this be so, the result will be that the defendant's grantors will have parted with their undivided interest in the whole of the rancho except that portion allotted to them, but have not a complete title in severalty to the portion allotted to them, inasmuch as the agreement and the proceedings under it can have no effect to transfer to the defendant's grantors the undivided interest in the portion allotted to them which belonged to the parties who did not execute the agreement. The defendant claims that the possibility of such an injustice is a conclusive argument in support of his position that an agreement like the one in question, between several parties, where performance by one is the consideration for the performance by the other, could not be intended to be and cannot legally be held to be binding upon any party until executed by all. In support of the defendant's position, the case of *Townsend* v. *Corning*, 23 Wend. 435, is cited, in which Judge Bronson says: 'A writing *inter partes* is prepared by which one party is to covenant for the payment of money, and the other for the conveyance of lands—each of these mutual covenants

being the consideration for the other. One party sits down and executes, but the other stops short, and for some cause, no matter what, does not execute the instrument. It is impossible, I think, to maintain that the party who has refused or neglected to bind himself can set up the instrument as a binding contract against the other party. There was, I think, a condition implied from the nature of the transaction, that the signing of one party should go for nothing unless the other signed also. But whether I have assigned the proper reason for the rule or not, the conclusion to which I have arrived, that the party who signs cannot be bound where the execution is thus incomplete, is not only in accordance with the justice of the case, but is well supported by authority.' (See also the cases of *Livingston* v. *Rogers*, 1 Caines, 584, and *Emery* v. *Neighbour*, 7 N. J. L. 145.) These authorities fully sustain the defendant's position. In the absence of any circumstance other than what appears on the face of the instrument, we think it cannot be held that this agreement was executed by the plaintiff's grantors and delivered to take effect like a deed poll, upon their affixing their own signatures, but that it was an inchoate instrument, only to become effective when executed by all the persons named as parties." (21 Cal. 68, 69.)

The question was disposed of, and the agreement held void, on the distinct ground that it was not signed by all the persons named as parties.

It does not appear in this case that the attempted partition included lands not within the rancho San Pablo, or if it did it was not noticed by the court. If it did appear, the court no doubt considered the point discussed sufficient to dispose of the case, and therefore did not allude to it. It will be observed that in this opinion the case of *Tewksbury* v. *Provizzo*, 12 Cal. 20, was not referred to, although it was cited by counsel for appellant. We see no contradiction in the opinions rendered in these cases. The facts were not the same in both cases, and the former could not and did not rule the latter.

The above decision in 21 Cal. was rendered during the October term, 1862. It has remained unmodified by any subsequent judgment to the present time. We would not be justified in disregarding it, after the lapse of nearly twenty years,

during which time doubtless many contracts and conveyances in regard to this land have been made upon it. We are compelled then to hold that the judgment of the court below, that the attempted partition of 1856 was null and void, is correct.

The court finds that the commissioners included in their attempted partition twelve thousand and three acres more than was included in the survey approved by the United States courts. This is sustained by the evidence.

It seems to us that this is fatal to the attempted partition, and that this position is sustained by *Hathaway* v. *De Soto*, 21 Cal. 192, which was decided at the same term and by the same court which decided *Tewksbury* v. *O'Connell.* The ruling in *Hathaway* v. *De Soto* is substantially approved in *Sutter* v. *San Francisco*, 36 Cal. 116.

We cannot see how a partition can stand, in which a much larger tract is included in the partition than the tract to be divided includes. Suppose several of the parties in interest are allotted portions outside of the tract to be divided : is there any equity which would justify such partition? It may be that parties may contract on such stringent terms that they are bound, though lands allotted to them are outside of the tract to be partitioned. But there is no such contract called to our attention in this case.

It is said that this partition of 1856 was acquiesced in by all who were parties to it for ten years. The evidence does not convince us of this; further, the court below in effect found the contrary, which in our judgment is sustained by the evidence.

Connected with the deed of partition of 1856, and to some extent arising out of it, is what is known as the "lawyers' title." The history of this title is thus given in the findings of fact:—

"That on the 12th day of August, 1851, Martina Castro de Alvarado signed and delivered to one Juan N. Espejo an instrument purporting to be a power of attorney from her to him, and which was afterwards recorded in the office of the county recorder of said Contra Costa County on March 11, 1853, in volume 2 of deeds, page 471 ; that said instrument purported to appoint said Espejo her true and lawful attorney ; among other things, to commence and prosecute an action for the partition of the rancho San Pablo, to appear for and defend her in any suit or

action whatsoever, to sign any bond, contract, or agreement that to him should seem proper, to pay and settle all debts and demands against her, and to give in payment any part or parts of her property, whether real or personal, and to make all necessary deeds and conveyances for the same, or any part thereof, to take possession of any lands and tenements belonging to her, or in or to which she might be entitled; and finally for her and in her name, to do all such deeds, acts, and things in relation to her property, estate, affairs, and business of every kind as she herself might or could do if personally present and acting therein, with authority to appoint a substitute; and pledged her property, real and personal, to her said attorney for any advances he might make on her behalf; which said instrument was witnessed by one George Charles Porhte. It was acknowledged before Edson Adams, justice of the peace for Contra Costa County, August 12, 1821, by the said subscribing witness, and her identity was proven by his oath, but the said instrument was never acknowledged by said Martina personally. Her husband, Juan B. Alvarado, did not join with her in its execution, but on October 12, 1852, he signed and acknowledged an instrument before George T. Hunt, notary public of San Francisco, California, which purported to approve and ratify the above-mentioned instrument signed by her in favor of the above-mentioned Espejo.

"That on the 16th day of August, 1851, he, said Juan N. Espejo, purporting to act as attorney in fact of said Martina Castro de Alvarado and in her name, together with one Eugene Musson, executed a certain instrument, purporting to be a contract between said Martina Castro de Alvarado and said Musson, and which said instrument was afterwards recorded in the office of the county recorder of Contra Costa County, on March 11, 1853, in volume 2 of deeds, page 474.

"That said instrument recited that said Musson had covenanted and agreed to conduct, manage, and carry to a final determination an action for the partition of the rancho San Pablo, and its dependencies and appurtenances, and to defend said Martina against the adverse claims of her brothers to said rancho, and that in consideration thereof the said Martina should give in payment for such services the one tenth part of her interest in or to

the said rancho de San Pablo as soon as the said suit in partition should have been brought to a final determination; the fees, costs, charges, and other court expenses to be advanced by said Musson, to be refunded by said Martina, with three per cent per month interest thereon at the termination of said suit. That said purported agreement or contract was not signed, acknowledged, or executed by said Martina individually. Her husband, Juan B. Alvarado, did not join in the execution of said instrument; but on October 12, 1852, he signed and acknowledged an instrument before George T. Hunt, notary public of San Francisco County, by which said last-mentioned instrument he purported to approve, confirm, and ratify the said instrument so as aforesaid attempted to be executed by said Martina by her pretended attorney in fact, Juan N. Espejo.

"That on January 14, 1852, Joaquin I. Castro and Eugene Musson executed a certain other instrument purporting to be a contract between said Castro and Musson, and which said instrument was afterwards recorded in the office of the county recorder of said Contra Costa County, on March 11, 1853, in volume 3 of deeds, page 1.

"That by said instrument the said Joaquin I. Castro assumed to employ and retain the said Musson to assist him in the administration of the estate of his deceased father, Don Francisco Maria Castro, until a final settlement of the same, to apply to the Probate Court of said Contra Costa County for letters of administration of said estate, and to present the title of said representatives of said estate to said rancho San Pablo to the board of United States land commissioners and have the same confirmed. That in consideration of services rendered and to be rendered in the premises by the said Musson, he was to have the whole amount of commissions that said Joaquin I. Castro would be entitled to as administrator of the said estate, distinct and apart from the fees usually paid to counsel for professional services rendered by them in matters similar to the one referred to in said agreement; that said Musson should be entitled to such fees as his services to said estate should be reasonably worth, independent of the services personally rendered to said Joaquin in the premises aforesaid, and all advances, traveling expenses, and other disbursements by Musson to be repaid him

in due course of administration by said Joaquin. The agree-
ment further provided, that should the Probate Court of Con-
tra Costa County empower said Joaquin, as administr'  r of
said estate, to present for confirmation to the title of the re  'e-
sentatives thereof to the rancho of San Pablo to the board
land commissioners, Joaquin I. Castro should give, in payment
of the services to be rendered by Musson, the one tenth part in
value of said tract of land or rancho de San Pablo so confirmed.
That said Musson did not perform or render the services stip-
ulated on his part to be performed and rendered, and has never
accomplished the result contemplated by said contract, or either
of them, nor has he been released from the performance
thereof."

In relation to this title, and bearing on the facts as above
found, the court held as a conclusion of law as follows:—

"That the claim of interest in said rancho de San Pablo,
commonly called and known as the 'lawyers' title,' and the
instruments upon which it is predicated, to wit, said instrument
purporting to be a power of attorney from said Martina Castro
de Alvarado to one Juan N. Espejo, dated August 12, 1851,
said instrument purporting to be an agreement or contract exe-
cuted by Eugene Musson and said Martina Castro de Alvarado,
by her attorney in fact, Juan N. Espejo, dated August 16, 1851,
and said instrument purporting to be an agreement or contract
executed by said Eugene Musson and Joaquin I. Castro, dated
January 14, 1852, which are referred to in the foregoing finding
nineteenth, were and are, all and every of them, void and inef-
fective, and all subsequent acts and claims thereunder or based
thereon were and are invalid and ineffective, in so far as they
purported or purport to convey or affect any interest in the
lands of said rancho, or any part thereof."

So far as this lawyers' title depends on the deed of 1856, it
must fall with it, for the reasons appearing above.  So far as it
depends on contract, it appears that the services required under
the contracts to be rendered were never performed, and we can-
not perceive that any right arises under such contracts.  Cer-
tainly there could not be any recovery upon such contracts as
having been performed, for there was never any performance.
If performance was waived and conveyances then made, a differ-

ent question would be presented; but we do not see that any performance was waived. Whatever waiver there was arose by virtue of the provisions of the deed of 1856, which was properly held null and void.

There can hardly be a doubt that there was no intention to waive the services, under the contracts referred to by the partition deed, unless it was valid. The deed being void, the parties were remitted to their rights under the contracts, and there having been no performance, we cannot see that any right vested in the lawyers, save *perhaps* to recover for services accepted what they were reasonably worth. But on this latter point we decide nothing. The contracting parties must seek whatever redress they are entitled to by the remedies which the law affords.

The court below held certain contracts, and a power of attorney set forth in the finding last quoted and in the conclusions of law quoted also above, void and ineffective, and all subsequent acts and claims thereunder or based thereon void and ineffective, in so far as they purport to convey or affect any interest in the lands of said rancho, or any part thereof.

Inasmuch as there was no performance of the services under these contracts, we think the court below properly held that they gave no right, legal or equitable, to the land. We do not understand by this that the court intends to hold that subsequent contracts, valid in their character, though arising out of the contracts referred to, may not have conferred on the lawyers employed — Musson, Sanderson, and Hepburn, or those claiming under them — a legal or equitable right to participate in the division of the land.

In regard to a deed to Henry Wilkins, the court found as follows:—

"That on the 15th day of July, 1856, Martina Castro de Alvarado, and Juan B. Alvarado, her husband, executed and delivered to Henry Wilkins a certain instrument, purporting to be a conveyance of certain interests in the said San Pablo rancho, which said instrument was recorded in the office of the county recorder of Contra Costa County, on September 29, 1857, in volume 6 of deeds, page 57; that on the same July 15, 1856, the same Henry Wilkins executed and delivered to said

Martina Castro de Alvarado a certain other instrument, purporting to be a declaration or acknowledgment of trust, which said last-mentioned instrument was recorded in the office of said county recorder on the said September 29, 1857, in volume 6 of deeds, p. 58; that by and in said last-mentioned instrument the said Henry Wilkins acknowledged that the lands mentioned in said first-mentioned instrument were held by him in trust; first, to join in such deed and agreement for a partition of said San Pablo Rancho, as said Doña Martina Castro de Alvarado should become a party to and sign; and secondly, to convey such interest as should remain in him, after joining in such deed of and agreement for a partition, to Joseph Emeric, as soon as said Emeric should so arrange with Jesus Maria Castro; that said Castro should convey all his interest in said rancho to the said Emeric, and said Emeric should, simultaneously with or after such conveyance, ratify said deed of and agreement for a partition, so that said partition should stand; and in the event that such arrangement, conveyance, and satisfaction should not take place, then to be held in trust for the benefit of the parties to said deed of partition, in the proportion and in the manner therein indicated, and, in so far as might be, to maintain and carry out the same; that said instruments constituted parts of one and the same transaction, and were, in fact, an integral part of said agreement for partition, to stand or fall with the same; and that their object and purpose, and the only consideration upon which they rested, was such partition, to facilitate and perfect which they executed as aforesaid."

This finding is sustained by the evidence.

The conclusion of law as to this deed to Wilkins is, that it is void and ineffective, and did not convey to Wilkins, as trustee or otherwise, any interest in the rancho out of Martina Castro de Alvarado or her husband, and that no trust was created thereby. The court properly held that the deed was void and ineffective, as it was dependent on the partition deed of 1856.

In regard to certain deeds, which in the progress of this cause have acquired the appellation of "lieu deeds," the court found the following facts:—

"That on March 21, 1862, the said Martina Castro de Alvarado and Juan B. Alvarado, her husband, by deed of con-

veyance dated on that day, acknowledged March 21, 1862, and recorded March 22, 1862, in volume 9 of deeds, page 540, in the county recorder's office of said Contra Costa County, gave, granted, bargained, sold, and conveyed to Maria Victoria Delfina Alvarado, daughter of said Juan B. and Martina, all their right, title, and interest, divided or undivided, in and to the said tract of land so known as the rancho de San Pablo, together with all and singular the tenements and hereditaments, including orchards, fences, houses, and all other improvements thereon, belonging to said parties of the first part. .

"That afterwards the said Maria Victoria Delfina Alvarado, daughter and grantee of Martina Castro de Alvarado and Juan B. Alvarado, her husband as aforesaid, and who had as aforesaid succeeded to all their right, title, and interest in the said San Pablo Rancho, executed and delivered on the dates and to the grantees hereinafter mentioned, deeds of conveyance whereby she in the terms in said deeds contained, and hereinafter specified, remised, released, and quit-claimed to said grantees respectively various undivided sections of said rancho, in lieu of certain specific portions of said rancho, described in certain previous deeds which had been executed and delivered to such persons or their grantors, by said Martina Castro de Alvarado and Juan B. Alvarado, which said previous deeds purported to convey all the right, title, and interest of said Martina and Juan B. Alvarado in said specific tracts, by metes and bounds; · that each of said first-mentioned deeds, commonly known as lieu deeds, recited such previous conveyance or conveyances, in lieu of which it was given, and purported to convey an undivided portion of said rancho, equal and equivalent in quantity of land to such specific tract or tracts described in said previous deeds.; that said grantees named in said lieu deeds received and accepted the same with the intent to receive and accept, and it was the intent of the grantor thereby to convey undivided interests in said rancho, equal and equivalent in quantity of land to and in lieu of such specific tract or tracts described in said previous deeds respectively.

"That said grantees were not, nor was any of them, deceived, imposed upon, or defrauded into accepting or receiving said lieu deeds, or any of them; nor was there any combination,

confederacy, conspiracy, fraud, or undue influence by anybody
in connection with said lieu deeds, or the execution or receipt
of them or any of them; that said lieu deeds were executed,
delivered to, and received by the following-named grantees on
the dates, and were recorded by them on the dates, and in the
office of the county recorder of said Contra Costa County, as
follows, to wit." Here follows a specific list and findings as to
the grantees in these lieu deeds. .

The foregoing finding of facts is sustained by the evi-
dence.

As regards these lieu deeds, the court found the following
conclusion of law, which in our judgment is a correct legal
deduction from the facts found:—

"That the respective deeds of conveyance executed by Maria
Victoria Delfina Alvarado, daughter and grantee of Martina
Castro de Alvarado, and Juan B. Alvarado, her husband, men-
tioned in the foregoing finding twenty-fourth, were and are
valid and effective for the uses and purposes expressed in them,
and take the place of the respective deeds therein respectively
mentioned, and in lieu of which they were respectively given
and accepted, as between the parties thereto, and their success-
ors in interest."

It is contended that the acceptance of these lieu deeds by the
grantees therein did not estop them from claiming under their
original conveyances, or divest them of title, legal or equitable,
which vested in them thereby.

The parties claiming under the lieu deeds are estopped to
claim the lands in their original conveyances, in lieu of which
these deeds were given. They are estopped by the terms of
their contract. They were given and accepted in lieu of the
former conveyances. They cannot then hold under the lieu
deeds and against them too; in other words, they cannot blow
*hot and cold*, or assume inconsistent positions. (See Broom's
Leg. Max., *Allegans contraria non est audiendus*, p. 129, etc.)
Whether they are thus divested of whatever title was conveyed
by the original deeds, without a reconveyance in each case, is
immaterial. They are in equity; and if necessary in the further
progress of the case the court can compel such reconveyances as
are required, unless the rights of innocent purchasers have inter-

vened; but there is no finding here that there are any such purchasers.

In relation to certain actions brought by Antonio Castro the court found the following facts:—

"That on October 15, 1851, Antonio Castro, who is otherwise known as Pablo Antonio Maria Castro, commenced an action in the then District Court of the State of California, in and for the county of Contra Costa, against Joaquin I. Castro, to recover the sum of four thousand dollars and costs; that on October 23, 1851, the defendant, Joaquin I. Castro, appeared in said action, and filed his answer therein; that on the 3d day of January, 1854, the following order was entered in said action in the District Court of the seventh judicial district of said State, in and for said Contra Costa County, viz.:—

"*Antonio Castro* v. *Joaquin I. Castro.* 'On motion of plaintiff's attorney, ordered a nonsuit be entered, and that execution herein be stayed until the 1st of November, 1854, and that the costs herein bear interest at two per cent per month'; that there are on the page of the judgment book, in which said judgment of nonsuit was entered and under the certificate of authentication thereto, the following word, character, and figures, viz., 'Costs, 62.85$,' which were placed there long after the rendition of said judgment and the adjournment of the term at which it was rendered, without the authority of said court, and they formed no part of said judgment; that on October 29, 1855, the clerk of said court, treating the said order, word, figures, and character as a monetary judgment in favor of said Joaquin I. Castro and against said Antonio Castro, issued, under the seal of said court, and to the sheriff of said Contra Costa County, a paper purporting to be an execution, reciting that a judgment had been rendered, and commanding him to make out of the property of Antonio Castro the sum of sixty-two dollars and eighty-five cents, with interest at the rate of two per cent per month from the date of said judgment of nonsuit, and accruing costs.

" That on October 15, 1851, the asid Antonio Castro commenced another action in the same District Court against Juan P. Eudarte, to recover the sum of seven hundred dollars; that the same defendant, Eudarte, appeared in said action and

filed his answer therein; that afterwards, and before October 4, 1853, the said Eudarte died, as appears by the adjudication of said court, by an order entered on the minutes thereof on October 4, 1853, in the following language, to wit:—

"'*Antonio Castro* v. *Juan Pablo Eudarte.* The death of defendant being suggested and admitted by counsel, it is ordered that the suit be revived against the heirs and legal representatives of the deceased defendant'; that afterwards, on January 3, 1854, and after the said Eudarte had departed this life, the following order was entered in the District Court of the seventh judicial district of said State, in and for said Contra Costa County, in said action, viz.:—

"'*Antonio Castro* v. *Juan P. Eudarte.* On motion of plaintiff's attorney, ordered that a nonsuit be entered, and that execution herein be stayed until November 1, 1854, and that the costs herein bear interest at two per cent per month'; that there are on the page of the judgment book in which said judgment of nonsuit was entered, and under the certificate of authentication thereto, the following word, character, and figures, viz., 'Costs, 63.20$,' which were placed there long after the rendition of said judgment and the adjournment of the term at which it was rendered and entered in said book, and without the authority of said court, and they formed no part of said judgment; that on October 29, 1855, the clerk of said court, treating the said order, word, figures, and character as a monetary judgment in favor of Juan P. Eudarte and against said Antonio Castro, issued under the seal of said court, and to the sheriff of said Contra Costa County, a paper purporting to be an execution, reciting that a judgment had been so entered, and commanding him to make out of the property of Antonio Castro the sum of sixty-three dollars and twenty cents, with interest at the rate of two per cent per month from the date of said order of nonsuit, and accruing costs."

Executions on these proceedings were issued, treating the same as money judgments against Antonio Castro, levies on his interest were made on them, and it was advertised and sold, and deeds made to the assignee of the purchaser. The court found, as a conclusion of law, that these judgments were void and ineffective—or rather, that there were no such judgments—and

that the purchaser derived no title under them. It is contended that this conlusion was erroneous.

As the Practice Act of 1851 stood at the time in which these proceedings were had, the party in whose favor judgment was rendered was required to deliver to the clerk of the court a memorandum of the items of the costs to which he was entitled. The memorandum, sworn to as required by the statute, was to be delivered to the clerk within twenty-four hours after the rendition of the verdict. (Pract. Act of 1851, § 510.) By section 511 of the same act, the clerk was required to include in the judgment entered up by him the costs, the percentage, etc.

In *Chapin* v. *Broder*, 16 Cal. 413, in relation to a judgment for costs, bearing date 22d August, 1854, the court held that the clerk had no right to insert the costs after the judgment was entered up and the record completed. The court remarked as follows: "The language of the statute was that he [the clerk] should include the costs in the judgment, and not that he should enter the judgment and at some subsequent period insert the costs. His authority terminated with the entry of the judgment, and if by mistake or otherwise the costs were omitted, the remedy was by motion to amend. The court alone was competent to grant the relief, and the act of the clerk was illegal and void."

In the case cited, the court held such judgment void on a collateral attack. This ruling must govern in this case. It does not appear from the finding of fact, that the costs were ever included in these judgments entered against Antonio Castro. A note appears to have been made of the amounts of costs, under the certificate of authentication to the entry of the judgment in the judgment book, and these amounts were not included in the judgments. On this ground the court below properly adjudged that the judgments were void. The proceedings of sale, etc., under these so-called judgments, fall with the judgments, and conferred no title on the purchaser.

The petition of J. I. Castro to the board of land commissioners for confirmation of the claim for the rancho San Pablo was offered in evidence. To this, Mr. Brooks, on behalf of the defendants represented by him, objected *generally*, conceding at the same time that it would be admissible "to show the juris-

diction of the land commission, and support the final decree of confirmation," but he states that it was not offered in connection with any other proceedings, but as an independent document. The court overruled the objection, and an exception was made and noted.

It is a mistake that it (the petition) was not offered in connection with any other proceedings. It is stated in the bill of exceptions that it was offered along with the copy of the will attached to the petition, the opinion of the board confirming the claim, and the decree of confirmation.

. Although such petition was not necessary in presenting the claim for confimation (see eighth section of the Act of Congress of 3d of March, 1851, "to ascertain and settle private land claims in the State of California," 9 U. S. Stats. 631), as the presentation of the claim or grant was sufficient, still we do not see that the evidence was not admissible. In *Tappan* v. *Beardsley*, 10. Wall. 427, it was held admissible to prove the fact that such a proceeding was instituted, the date, and the result. We find no error in the ruling of the court below in admitting the document. The legal effect of the document was not passed on by admitting it in evidence.

The plaintiff offered in evidence a deed from J. I. Castro to Martina Castro de Alvarado et al. This deed was objected to on the ground that the grantor, being a trustee, could not alter the trust or alien the land without the consent of the *cestuis que trust*. The objection was overruled and an exception was taken.

The deed objected to purports to convey the legal title, and recites, that it had been suggested, that this title had, by virtue of the decree of confirmation of the rancho San Pablo by the board of land commissioners, vested in the grantor in trust for the various parties in interest according to their respective interests, viz. : to Martina Castro de Alvarado fifteen twenty-seconds of the rancho, and to five of his brothers five twenty-seconds thereof, and to other parties, heirs of Francisco Maria Castro, or parties claiming under them, an undivided four fifths of one twenty-second part. This conveyance was made with the declared purpose of conveying to the grantees the legal title to their shares in the land.

The objection went merely to the effect of the conveyance.

It was properly admitted in evidence. The operation or legal effect of the conveyance was a matter for further consideration, when the court came to render judgment. The court did not err in its ruling.

The motion to dismiss the action was properly denied.

There was no error in disallowing the question put to Forbes as to whether the mental capacity of Doña Gabriela "was sufficient to enable her to comprehend an American deed translated into Spanish." Forbes substantially answered the question in his testimony.

The statement of Carrera to Goodale, made long after the transaction to which it referred, was hearsay, and was properly excluded. There was no evidence of a fraudulent conspiracy. If there was, there is no evidence that Carrera was one of the conspirators, and if he was, it was hearsay, being no part of the *res gestæ.*

We perceive no error in the ruling of the court in relation to disallowing the question as to the difference between the original draft of the partition agreement and the perfected document. Besides, the witness subsequently stated everything that was inquired about when the objection was made.

We have examined the other errors in law to which exceptions were taken, and find that the court committed no error in its rulings in regard to them.

The statute does not require the order appointing a guardian *ad litem* for an infant to appear in the judgment roll. (Code Civ. Proc. § 670.) The first subdivision of this section plainly does not require it. The second subdivision specifies what papers shall constitute the judgment roll in all other cases except where the complaint has not been answered by any defendant. These papers are the pleadings, a copy of the verdict of the jury or finding of the court or referee, all bills of exceptions taken and filed, a copy of any order made on demurrer or relating to a change of parties, and a copy of the judgment. A further provision is made in this section in a case where there are two or more defendants in the action, and any one of them has allowed judgment to pass against him by default. In this last case the summons, with the proof of its service, must also be added to the other papers above mentioned in this second subdivision.

In neither of the subdivisions is the order of appointment of guardian mentioned. The order relating to a change of parties does not include any such order. There is no change of parties by the appointment of the guardian *ad litem*. The guardian does not become a party. The infant is the party, and he only appears by the guardian. The latter is appointed to appear for the infant, and to manage and take care of the suit for such infant when he is plaintiff, and to appear, manage, and take care of the defense for the infant when he is defendant. In case of an infant defendant, the answer is put in by the guardian for the infant. The guardian has authority to appoint an attorney to put in such answer, but the attorney so appointed is the attorney of the guardian and not of the infant. The language of the statute of this State, in all the phases it has assumed, authorizing the appointment of a guardian for infants in actions brought by or against them, shows clearly that the infant only is the party. (See Prac. Act, § 9; Code Civ. Proc. § 372.) The guardian is to appear for them, and is no more a party to the action than the attorney, who appears in an action for one who has attained his majority, is a party to the suit in which he enters his appearance. (See *Fox* v. *Minor*, 32 Cal. 116; *Karr* v. *Parks*, 44 Cal. 48.) For the reasons above given, we do not think that the order relating to a change of parties mentioned in the second subdivision of the section above cited includes an order appointing a guardian *ad litem*, and in no case is such an order required to be inserted in the judgment roll.

In England it appears to be different. (See 1 Tidd's Pr. 100; 2 Saund. 1171, n. 1.) The practice in the English courts seems to be this: In the case of an infant plaintiff suing by guardian or *prochein ami*, it is stated in the declaration that the guardian is specially admitted, and when this is omitted it is error; and the insertion of those words in the declaration or plea has been holden to be sufficient and no error, though there be no admission of the guardian or *prochein ami* on the roll. (*Rawlyn's Case*, 4 The Reporter, 53 *b*, 54 *a*; *Swift* v. *Nott*, 1 Sid. 173.) If, in fact, there be an admission of the *prochein ami* or guardian by the court, but it is not entered of record, the court will give leave to enter it. (*Young* v. *Young*, Cro. Car. 86; *Combers* v. *Watton*, 1 Lev. 224.)

On appeal from a judgment, the examination in this court is confined to the judgment roll, and any bill of exceptions, statement on motion for new trial, and statement of the case on which the appellant relies. (Code Civ. Proc. § 950.) The questions to be considered must arise on these papers. If they do not thus arise, the duty of deciding them is not by law devolved on the court. (*Rush* v. *Casey*, 39 Cal. 339; *McAbee* v. *Randall*, 41 Cal. 136; *Gregory* v. *Nelson*, 41 Cal. 278.)

On an appeal from an order denying a new trial, the scope of inquiry is limited to the order appealed from, and the judgment roll, and the affidavits or bill of exceptions or statement used on the hearing. (Code Civ. Proc. §§ 661, 662.) Where an appeal is taken from an order granting or refusing a new trial, on the minutes of the court, or from an order granting a new trial by the court on its own motion, a statement prepared subsequently to such ruling of the court, with the judgment roll and a copy of the order, constitute the papers on which the same are to be heard. (Code Civ. Proc. §§ 661, 662.) Transcripts of these papers are only furnished to this court in cases of appeals above stated.

Holding, as we have said above, that the scope of inquiry in this court is not enlarged on appeal from an interlocutory judgment in partition, we do not perceive that we are permitted to look outside of the documents which would constitute the judgment roll when it is to be made up, or to consider any questions not arising on such documents or the statement or bill of exceptions in the case. Neither is the order appointing the guardian, nor the petition for such appointment, one to appear in the record or judgment roll under our practice. In fact we do not think a petition in writing for such appointment is required. The appointment is to be made on application. (See Prac. Act, § 10; Code Civ. Proc. § 373.) And this application may be made *ore tenus* in open court as well as in writing. Although it would be better practice to file a petition alleging the facts requisite to show the jurisdiction of the court, still it would not be *mala praxis* to make the application for such appointment orally.

We proceed now to consider the matters to which the foregoing observations as to the appearance of infants are pertinent.

It is stated in the bill of exceptions that no summons was served upon the infant defendants Francisco Dutra, Juan Dutra, José Dutra, Mary Dutra, Maria Magdalena Dutra, Agustin Dutra, Ignacio Dutra, Maria Dutra, Maria Dolores Dutra, Felicia Dutra, Willie B. Palmer, Laura A. Palmer, Cassie A. Palmer, Nellie B. Palmer, Millie V. Chambers, Fannie R. Chambers, Thomas J. A. Chambers, James Lloyd Chambers, Robert Newcomb Wood, Richard Cross Wood, Lucetta Wood, Annie E. Wood, Frank G. Wood, William Henry Wood, Mary Moitozo, Antonio Moitozo, Ignacio Moitozo, Rosa Moitozo, and Angelica Moitozo, or either of them.

These infants were not original parties to the action, and in regard to them, the following appears by the recital in the decree: "And it further appearing that the other of said infants above named, who were not original parties to said action, were children of original parties, who had died since the commencement of said action, and since the filing of their answers herein; and it further appearing that, in all such cases, the executors or administrators of such deceased persons had been substituted in place of said decedents, and the action continued against them, and that such executors or administrators had respectively appeared herein, on behalf of the interests of the estates of such deceased persons; but that application was also made to have guardians *ad litem* appointed for such infant children of persons who had appeared and answered in such action, and afterwards deceased."

The decree further states that William H. Patterson, Esq., an attorney of this court, was appointed guardian *ad litem*, among others, of Frank Dutra, Juan Dutra, José Dutra, Agustin Dutra, Maria Dutra, and M. Magdalena Dutra, and duly filed answers in the cause as such guardian *ad litem*, and on behalf of such infants, and each of them.

In relation to the Palmer infants above mentioned, it is stated in the decree that B. S. Brooks, Esq., an attorney of the court, was appointed guardian *ad litem* of William Beales Palmer, Laura Adeline Palmer, Clara Augusta Palmer, and Nellie Bell Palmer, and duly filed an answer in the cause as guardian *ad litem*, on behalf of such infants and each of them. The answers for the Palmer infants and the Dutra infants,

except M. Magdalena Dutra, appear in the record. As to the Wood and Moitozo infants, the record shows that the action was revived as against them on motion of their general guardians respectively, and on motion the answer of their ancestors was in each case allowed to stand as their answers. As regards the Chambers infants, it appears by recital in the decree that each of them had a general guardian of their estates regularly appointed; that the guardian, who in this case was Caroline M. Chambers, was allowed by the court to represent them and their interests in the action, and that the guardian did appear and file an answer as such guardian, and for the infants above referred to. This answer appears in the record.

It is unnecessary to issue a summons to bring in the infant parties. It might be done on motion under section 385, Code of Civil Procedure. (Prac. Act, § 16.) This section as it stood in the practice act was somewhat modified by the Code of Civil Procedure, section 385, from what it was as originally framed, and was further modified in 1874, but these changes do not affect the question here. Under the section as it stood in the practice act, or under any of its subsequent modifications, the infants might have been made parties and the suit continued against them on motion. The motion and order were sufficient. (See *Allen* v. *Walter,* 10 Abb Pr. 379; *Coon* v. *Knapp,* 13 How. Pr. 175; *Gordon* v. *Sterling,* 13 How. Pr. 405; *Green* v. *Bates,* 7 How. Pr. 296.) In *Gordon* v. *Sterling,* above cited, infant defendants were thus brought in in an action for partition, and it was held regular under section 121 of the New York Code of Practice, which as to this question is the same as ours. This section 121 provides that if the motion is not made within a year after the death, a supplementary complaint was necessary. In *Gordon* v. *Sterling,* the motion was within the year. It is therefore on all fours with this case, as regards the question presented. The order continuing the case as against the infant defendants should have been served, and no doubt was. They appeared in the case and answered regularly. This is sufficient. (*McCreery* v. *Everding,* 44 Cal. 286.) The only objection to the proceeding appearing in the bill of exceptions in the case before us is that no summons was served on the infants. The above, in our opinion, disposes of this point.

As to the appointment of guardians, we see no reason to hold that they were not properly and regularly appointed. The Wood, Moitozo, and Chambers infants appeared by their general guardians, and this was regular, according to *Gronfier* v. *Puymirol*, 19 Cal. 619, approved in *Smith* v. *McDonald*, 42 Cal. 484. These decisions have stood so long as correct rulings that we would hardly undertake to overrule them. As regards the others, and in fact all of them, we think no summons was required to give the court jurisdiction, for the reasons given above. The section of the Code of Civil Procedure (373) referred to by counsel, in our opinion, only applies to the original process issued when parties are brought in for the first time, and not to those brought in as representatives or successors of parties deceased. We see no reason to conclude that the guardians *ad litem* just above referred to were not regularly appointed. The court seems to have been careful in appointing the guardians last named, having selected for that purpose two competent and distinguished members of the bar. It sufficiently appears that these infants were brought in and regularly proceeded against, and in this regard we find no error.

The attention of the court is further called to the fact that there is in the transcript no petition for or order appointing a guardian *ad litem* for George Preston Warfield and Teresa Ada Warfield, minor heirs of Preston Warfield, deceased. These minors were non-residents of the State on the 19th of November, 1867, when this action was commenced, and were served with summons by publication. Their residences were not known, and therefore no copy of summons or complaint was sent by mail to them or either of them. Neither was the residence of their mother known, and therefore no copy of summons or complaint could be mailed to her. There is no statement in the affidavit or pleadings as to the age of these minors. To sustain the proceedings of the court below, we must presume, until the contrary is made to appear, that these minors were over the age of fourteen years, and in such case the law required no service of summons or complaint on the mother, or other person having them in charge. (See Prac. Act, §§ 29, 30; Code Civ. Proc. §§ 411, 412.)

The transcript shows that an answer for these minors was

filed by J. M. Seawell, Esq., then as now an attorney of this court, as their guardian *ad litem*, on the 17th day of February, 1871. This answer was verified by Mr. Seawell on the same day. It appears from the bill of exceptions that Mr. Seawell appeared with other counsel for defendants at the trial and took part in it. It is stated in the interlocutory decree that the gentleman above named was duly appointed guardian *ad litem* for the minors above named, "upon proper application therefor, and due proceedings had for that purpose," and that he filed an answer as such guardian for them and each of them. That Mr. Seawell appeared and made defense for these infants, we do not think admits of a doubt.

For the reasons above given, we do not think that the questions as to the petition or order for the appointment of guardian *ad litem* are before us for consideration. The court had jurisdiction of the infants by service of summons. (See Code Civ. Proc. § 416); and answers for them were filed by the guardian *ad litem*. As to the Moitozo infants, the answer is put in by their general guardian. The same is true of the Chambers infants and the Wood infants. The Dutra infants answered by W. H. Patterson, their guardian *ad litem*, and the Palmer infants by B. S. Brooks, their guardian *ad litem*. Upon the facts above stated we do not see that on this appeal we can reverse the judgment or order of the court below for the reason that the order of appointment does not appear in what in this case is properly the record. We think that we are justified in assuming that the parties having been served and having answered by their general guardians or guardians *ad litem*, where the record is silent, that the order of appointment wherever required was regularly made.

A further consideration here is worthy of notice in regard to the Warfield infants, where the answer was filed by an attorney and counselor of this court, Mr. Seawell, as the guardian *ad litem*. Without an order appointing him, he would be guilty of contempt for misbehavior, and might be dealt with for it, and would probably be subject to a proceeding for removal or suspension from the discharge of his function as attorney. (Code Civ. Proc. § 1209, subds. 3, 6; § 282, subds. 2, 4; § 287, subd. 2.) This we cannot presume.

A few remarks further on this point will explain the significance of the ruling here made. An absence of the order appointing a guardian *ad litem* in the case like the one before us is a defect in the proceedings known as an irregularity. (*Keaton* v. *Banks*, 10 Ired. 381.) Irregularity, as defined by Chitty, "is the technial term for every defect in practical proceedings for the mode of conducting an action or defense, as distinguished from defects in pleadings, which can only be objected to by demurrer or motion in arrest of judgment, or by writ of error." (3 Chit. Prac. 509.) The learned author proceeds thus: "It is a comprehensive term, including all formal objections to practical proceedings, and is of three descriptions, viz.: first, such deviations as constitute a total *nullity;* secondly, such as are mere *irregularities*, and can only be objected to in a reasonable time, and subject to certain qualifications; and thirdly, the non-observance of certain rules or enactments that have been deemed merely *directory.*" (3 Chit. Prac. *ut supra.*)

Under the English practice, where there must appear in some shape in the record the fact of the appearance of an infant defendant by guardian *pro lite*, when no such matter appeared in the record, it was error, and the defect might be redressed by writ of error. If the appearance by guardian was recited in the count or plea, or appeared in the record, and in fact no such guardian had been appointed, it was that kind of error known as error in fact, which error is one which occurs where there is error in the process or proceeding, not apparent on the record, and which must be shown to the court by affidavit or petition. (See *Pickett* v. *Ledgerwood*, 7 Peters, 148; 2 Saund. 101 *a.*) Conceding that a writ of error might be brought in this State, still no such remedy is resorted to here. This remedy need not be further mentioned. In fact, it appears that when such a writ does not exist, the same result may be reached by motion —the usual mode of correcting irregularities. It has been held that the motion is a substitute for such writ of error. (See *Pickett* v. *Ledgerwood*, 7 Peters, 146.) The same is said in 4 Minor's Institutes, 856, as to the practice in Virginia.

The defect in this State is an irregularity, and may be redressed on motion. (See *Whitwell* v. *Barbier*, 7 Cal. 54; *Shaw*

v. *Gregoire*, 35 Mo. 342.) On a motion to strike out the answer of the person appearing as guardian *ad litem* for want of authority, the court below can pass on the question. If denied, a bill of exceptions may be drawn up and filed. The question is thus placed on the record, and may be reviewed on appeal from the judgment. Or the question may be brought before this court by motion for a new trial under the first subdivision of section 657, Code of Civil Procedure, as an irregularity in the proceedings of the court, making the fact appear by affidavit, as required by section 658, Code of Civil Procedure. The question in either case is called to the attention of the court below, and if the order appointing such guardian was actually made, and not entered by default or misprision of the clerk, the court can have the proper entry *nunc pro tunc*, and thus the defect is cured.

We will add here that it has been frequently held in New York, under a statute no less stringent on the subject than that of this State, that a judgment against infants, where no guardian *ad litem* had been appointed for them, was voidable and not void (see *Croghan* v. *Livingston*, 17 N. Y. 218; and *McMurray* v. *McMurray*, 66 N. Y. 177); and that the failure to appoint a guardian *ad litem* for an infant defendant was an irregularity which might be redressed on motion. (*Keaton* v. *Banks, ut supra.*) It will not be too late to move in regard to this matter of guardian *ad litem* when the case goes back to the court below.

The twenty-seventh, twenty-eighth, twenty-ninth, thirtieth, thirty-first, and thirty-second findings are as follows:—

"27. That no assessment was made or tax levied for the fiscal year 1855–56 upon the property described as follows: 'The one undivided eighth part of the rancho de San Pablo, or two thousand seven hundred and twelve and one half acres thereof,' as against the said Antonio Castro, or any other owner thereof, or person interested in the said San Pablo Rancho, and which property is described in a deed dated August 26, 1856, made by one John F. S. Smith, then late sheriff, and as late sheriff of the county of Contra Costa, to Charles P. Pollard, recorded September 5, 1856, in the recorder's office of said county, in volume 5 of deeds, page 215; that on August 10, 1856, the said Charles P. Pollard executed and delivered to Jacob M. Tewks-

bury an instrument purporting to convey to said Tewksbury all
the right, title, and interest which he had in and to the land
described in said instrument purporting to be a sheriff's deed,
and that said instrument purporting to be a deed from said Pollard to said Tewksbury was recorded February 26, 1857, in
volume 5 of deeds, page 366, in the recorder's office of said
county of Contra Costa.

"28. That no tax assessment or tax levy was made for the
fiscal year 1859–60, upon or against the lands purporting to be
described as follows : 'The certain tract or lot of land situate
in township No. 1 of Contra Costa County, and numbered and
designated on a map of survey of the San Pablo Ranch as made
by Nicholas Gray, deputy surveyor, in August, 1856, under an
agreement of partition and release among the owners thereof,
dated July 14, 1856, and made of record, together with the
report of the commissioners therein named to make partition of
said rancho, in the recorder's office of the said county, in volume
6 of deeds, pages 1 to 20 inclusive, reference to which is made
for full and perfect description of the same as follows, to wit:
All of lot numbered 49, except twenty-five acres of north corner,
set off in said partition to Jesus Maria Castro; the remainder,
being about two hundred and thirteen acres, valued at one dollar per acre,' and for which a paper purporting to be a tax
deed, dated October 5, 1860, was executed by James C. Hunsaker, sheriff of said Contra Costa County, to said Jacob M.
Tewksbury.

"29. That no tax assessment or tax levy was made for the
fiscal year 1859–60 upon or against the lands purporting to be
described as follows: 'Twelve acres of land situated in township No. 1 of Contra Costa County, and being the west end of
lot No. 132 of the ranch of San Pablo, as designated on a map
of survey of the said ranch, made by N. Gray, United States
deputy surveyor, in August, 1856, and made of record in volume 6 of deeds, pages 19 and 20, in the recorder's office of said
county, to which reference is made, and also to a deed from
J. M. Tewksbury to said party, for which see index of deeds in
said office'; and for which a paper, purporting to be a tax deed,
dated October 6, 1860, recorded June 17, 1862, in volume 10
of deeds, page 28, in said recorder's office, in and for Contra

Costa County, was executed by James C. Hunsaker, sheriff of said Contra Costa County, to said Jacob M. Tewksbury.

"30. That no tax assessment or tax levy was made for the fiscal year 1859–60, upon or against the lands purporting to be described as follows: 'Lot No. 54, of the partition of the San Pablo Ranch, containing forty-eight acres; for particulars of description see map of survey of said partition, as made by Gray, Forbes, and Cooper, commissioners appointed to divide the ranch among the heirs and owners thereof, in the year 1856, all of which is of record in book of deeds No. 6, of Contra Costa County records, pages 1 to 20 inclusive, reference to which is made; said land being in township No. 1 of said county'; and for which a paper purporting to be a tax deed, acknowledged December 6, 1860, recorded December 8, 1860, in the office of the recorder of Contra Costa County, in volume 8 of deeds, page 383, was executed by James C. Hunsaker, sheriff of said Contra Costa County, to said Jacob M. Tewksbury.

"31. That no tax assessment or tax levy was made for the fiscal or the revenue years 1860–61, upon or against the lands purporting to be described as follows: 'Forty-eight acres of land lying in the county of Contra Costa, township No. 1, being a part of the San Pablo Rancho, known and designated as lot No. 54, of the survey of said rancho, and map thereof, made by N. Gray, United States deputy surveyor, under an agreement of partition and distribution of said rancho, in 1856, which map and report and deed is of record in the recorder's office of Contra Costa County, in volume 6 of deeds, pages 1 to 20 inclusive, reference being thereunto made for particular description'; and for which a paper purporting to be a tax deed, dated December 9, 1862, recorded December 9, 1862, in the office of the county recorder of Contra Costa County, in volume 10 of deeds, page 309, was executed by John J. Mc-Ewen, sheriff and tax collector of said Contra Costa County, to said Jacob M. Tewksbury. That the Justice's Court purporting to have rendered the judgment recited in said last-mentioned tax deed had no jurisdiction or authority to render the judgment therein recited against any person or property.

"32. That no tax assessment or tax levy for taxes for the

fiscal or revenue year recited in a paper purporting to be a tax deed, bearing date December 13, 1862, and recorded December 13, 1862, in the office of the recorder of Contra Costa County, in volume 10 of deeds, page 325, was made upon or against the property purporting to be described as follows: 'All the southwest fractions of the northeast quarter of section No. 24, and the northeast fraction of the northwest quarter of section No. 24, and the south fraction of the east half of the southwest quarter of section No. 13, in township No. 1 north, range No. 5 west, meridian of Mount Diablo, the same being swamp or overflowed land, and the same piece surveyed by J. B. Abbott, county surveyor, for Joseph H. Brenneman, as appears by the receipt of Hiram Fogg, county treasurer of Contra Costa County, recorded in volume 1 of tule land records, in county recorder's office, pages 132 and 133, containing one hundred and thirty-three and fifty-seven one-hundreths acres, and also about twelve acres of land of the embarcadero near San Pablo, county of Contra Costa, known as Davis' landing, reference for a more perfect description being had to a deed of record in the recorder's office, county aforesaid'; and for which the paper purporting to be a tax deed above referred to was executed by John J. McEwen, sheriff of Contra Costa County, to said Jacob M. Tewksbury, as against any person or persons mentioned in said last-mentioned deed. That the Justice's Court purporting to have rendered the judgment recited in said last-mentioned deed had no jurisdiction or authority to render the judgment therein recited against any person or property."

The findings just above quoted as to the various assessments mentioned in them, are not in accordance with the law. The statute requires of the court, in giving the decision, to state separately the facts found and the conclusions of law. We interpret this to require of the court to find the facts specially, unmixed with the law, so that the judicial mind may see that the conclusion of law is a deduction of the law from the facts— the unmixed and ultimate facts—found. Such as we understand to have been the ruling of the court in *Breeze* v. *Doyle*, 19 Cal. 101. In this case, the test of the sufficiency of a finding is given in these words:. "Would they answer, if presented by a jury in the form of a special verdict?"—and further, the

special verdict "must present the facts so distinctly as to refer the court clearly to the questions of law arising on them." We are not aware that this case has ever been overruled. It is cited as authority in *Lucas* v. *San Francisco*, 28 Cal. 596; and *Pralus* v. *Pacific G. & S. M. Co.* 35 Cal. 35. Blackstone says such verdict must present the *naked facts*. (3 Blackst. Com. 377.)

Now, tested by the rule above stated, would such a finding be sufficient? In finding a special verdict, a jury must find the facts, leaving the law to be pronounced by the court on the facts so found. A jury was originally permitted to find a special verdict, so as to escape the responsibility and avoid the danger of having their verdict attainted. (3 Blackst. Com. 377.) This responsibility was a very serious matter, the penalties on conviction being very severe. (3 Blackst. Com. 403–405.) Such verdicts (special) arose on statute Westm. 2; 13 Edw. I., ch. 30, p. 2; Boote's Suit at Law, 176, and note 3 on same page; 3 Blackst. Com. 377.

As an instance for illustration: The issue whether there was an assessment of a particular piece of property for taxes for a year designated, is left to a jury to find a special verdict; or in other words, to find the facts specially as to such assessment, so that the court may pronounce the judgment of the law upon the facts so found. The jury render a verdict in this form: "We find that there was no assessment for taxes for the year mentioned." What facts are specially found in such a verdict upon which the court can pronounce as matter of law whether there was an assessment or not? Clearly none. No facts are presented to which the judicial mind can be applied. The jury has found that there was no assessment, and has referred nothing to the court to act on. In fact, the jury has found by such a verdict fact and law both, which is a general and not a special verdict. Boote's Suit at Law, 176 — definition of general and special verdicts.

It must be remembered that an assessment is made up of several constituents. In the first place, there must be the name of the person to whom the property is to be assessed. (Pol. Code, § 3650.) This person must usually be the owner if known to the assessor, and if not known, it may be assessed to unknown

owners. (Pol. Code, § 3636.) 2. There must be a list or description of the property. (Pol. Code, § 3650.) 3. The cash value of the property listed or described. (Pol. Code, § 3650.) Such are the material factors of an assessment, and they must appear on the assessment roll or book. (Pol. Code, § 3650.) Further, the valuation must be made by the proper officer authorized by law. Reference is herein made to the Political Code, but such were the elements of an assessment before the Code, and, in fact, during the entire history of the State.

The jury now, in finding the facts specially, where the issue presented is whether there was an assessment or not, may find in the very words what appears on the assessment roll or book, or may find that the names of owners, known or unknown, of the property were or were not inserted in the roll or book, or that property was or was not described, or that a valuation or no valuation was made, as the evidence may show.

If either of the factors above mentioned is lacking, in judgment of law, there is no assessment; or if it is found that the valuation was made by a person not authorized by law, there can be no valid assessment. So when the verdict finds in *hæc verba* the entries in the roll or book, or finds with regard to each element as above, the court can readily determine the judgment that the law pronounces on such facts. If any one fact or element required is wanting, there is no assessment; if all are present, there is an assessment. In this mode the object of the law is attained — which is to have the facts on which the issue depends found distinctly and clearly, so as to refer the court clearly to the questions of law arising on them.

The finding as to the assessments in this case is not of the character required. It finds no fact on which a question of law can arise. The court, in looking at the finding, sees nothing but that there was no assessment. This being so, there is nothing to be determined, and the inquiry is ended.

The thirty-second finding is defective, in finding no facts at all. It is stated in this finding that there was no tax assessment or tax levy upon or against certain property (describing it) in a fiscal year mentioned in a certain deed bearing date December 13, 1862, and recorded the same day in the office of the recorder

of Contra Costa County, but the contents of the deed are not found in any way, either by finding the deed *in hæc verba,* or by finding its substance.   Whether, therefore, there was or was not any tax assessment or tax levy for any fiscal year, cannot in any way be perceived by the court, and hence no conclusion of law can be pronounced on the finding.   Neither is the court informed what fiscal year is referred to.   Reference is made to a deed, which may be inferred to be evidence of the fiscal year alluded to.   If the evidence were found, it would not be sufficient; the law requires the facts and not the evidence of them to be found.

It is found also in the same findings that no tax levy was made for the fiscal years mentioned in them.   If the words "tax levy" were used as synonymous with assessment, then what has been said above disposes of the question in relation to such levy.   Levying a tax usually means the fixing of the rate at which property is to be taxed, and this is usually done by the legislature, either mediately or immediately; that is to say, by the legislature for the purpose of State taxation, and by the local governing bodies, such as boards of supervisors, etc., for local taxation, to which bodies the power of levying the tax is delegated by the legislature.   During the years mentioned in the above findings, such was the mode of levying which prevailed in this State.   (See Stats. 1854, p. 88; Stats. 1857, p. 325; Stats. 1858, p. 31; Stats 1860, p. 365, for revenue acts of years mentioned.)

We cannot conclude that the court below intended by the findings under consideration to declare that the legislature and the various local bodies to which this duty of levying the tax pertained did not perform it.   If it did so intend, a reference to the acts of the legislature, and of the local bodies referred to, would show that this was not true.

At the end of findings 31 and 32 are findings in regard to certain judgments rendered by Justices' Courts in suits for taxes, to the effect that the courts referred to had no jurisdiction or authority to render such judgments against any person or property.   The jurisdiction over the subject-matter, where the amount of taxes sued for did not exceed two hundred dollars, was vested in Justices' Courts by the Act of April 3, 1861 (Stats.

of 1861, §§ 1, 2, 4, 5, pp. 121, 122.)   If such courts did not
have jurisdiction of the person by reason of the fact that there
was no service of process to bring such person into court, to
make answer in the action that fact should have been specially
found.   The court cannot know such to be the case, under a
finding expressed in the general language of the finding referred
to.

The findings as to these judgments refer to them as the judg-
ments recited in the tax deeds mentioned in the findings.   The
tax deeds are not found *in hæc verba,* nor are the recitals; but
if we are at liberty to examine them, it will be seen that the
judgments recited in them were rendered in March, 1862, at
which date, under the Constitution of 1849, the jurisdiction of
the District Courts did not embrace cases in equity, where the
amount in dispute was under two hundred dollars.   We are of
opinion that the Justices' Court had jurisdiction in suits for taxes
where the amounts sued for were less than two hundred dollars,
under the act above mentioned.   If the amounts sued for
exceeded two hundred dollars, then such court did not have
jurisdiction.   But we cannot know whether this is so or not,
unless such is shown to be the fact by a finding to that effect.

The findings in regard to these judgments are insufficient, in
not presenting the facts so found that this court can say whether
the Justices' Courts had or had not jurisdiction.   (See on this
point *Suydam* v. *Williamson,* 20 How. 427; *Birckhead* v. *Brown,*
5 Hill, 634, opinion by Bronson, J.; *Miller* v. *Shackelford,* 4
Dana, 261; 4 Minor's Institutes, 752.)

Upon these issues — these as to the assessments for taxes and
the jurisdiction of the Justices' Courts to render the judgments
aforesaid, on which findings were not waived — there are really
no findings.

In regard to the assessment and levy of taxes for the county
of Contra Costa for the years mentioned in the findings above
quoted, we refer further to the fact that the assessment of taxes
upon all property real and personal for the county aforesaid, for
the fiscal years ending respectively on the 1st of March, 1860,
and on the 1st of March, 1861, were legalized by the Act of
the 8th of April, 1861.   (See Stats. 1861, p. 119.)

It is said that the allegations of the answer of defendant

Jacob M. Tewksbury, as to the deed of Gabriela Castro to Martina Castro de Alvarado, are not negatived by the findings, and are therefore to be taken as true. On this point we are referred to certain portions of the answer, which we have examined. The portions referred to are paragraphs 15 to 18, both inclusive, of the amended answer of the defendant Tewksbury. We think the material allegations are disposed of by the findings. The material allegations in the answer are, that the document referred to was not under seal when signed or delivered or acknowledged, but that a seal was placed on it afterwards by some person unknown to the defendant, "without any authority from said Gabriela"; and further, that at the time it is claimed she executed this instrument, she was not of sufficient mental capacity to enter into such contract as indicated by the paper, that she was not competent to execute a deed. Whatever other allegations appear in the portions of the answer referred to are allegations of evidence or conclusions of law, as to which no findings are by law required.

The material allegations above mentioned are, in our judgment, disposed of by the eighth and twenty-third findings. The matters found in the eighth finding substantially find that the instrument of conveyance referred to in it, and in the answer of Tewksbury above mentioned, was sealed on the 4th of August, 1851, when it was executed. The issue made by the allegations as to the mental capacity of Gabriela de Castro is clearly passed upon in the twenty-third finding.

It is argued that the adverse possession of the appellants is a bar to the partition. Conceding this to be so for the purpose of the argument, the court finds that there was never any adverse possession (see sixteenth finding) by any one of the defendants, and as a conclusion of law, that there was never any ouster. (See eighth conclusion of law.)

But it is said that the evidence is insufficient to sustain such finding. In answer to this, it may be said that the Statute of Limitations did not commence running in this case until the final approval of the survey by the proper District Court of the United States. (*Morris* v. *De Célis*, 61 Cal. 55.) The survey was not finally approved until the 17th of August, 1864, and this action was commenced on the 19th of November, 1867.

If we are in error in holding that the Statute of Limitations did not commence running at the time just above mentioned, then it could not have begun to run until the issuance of the patent. (*Gardiner* v. *Miller*, 47 Cal. 570; *Same* v. *Schmaelzle*, 47 Cal. 588; *McManus* v. *O'Sullivan*, 48 Cal. 17; *Hagar* v. *Spect*, 48 Cal. 408; *Galindo* v. *Wittenmeyer*, 49 Cal. 12; *Hoadley* v. *San Francisco*, 50 Cal. 273; *Reed* v. *Ybarra*, 50 Cal. 465; *Miranda* v. *Toomey*, 51 Cal. 165); and the patent was not issued until after the action was begun. Such being the case, it is unnecessary to consider the question of the insufficiency of the evidence to sustain the finding as to the character of the possession, whether adverse or not.

The decree in this case is made under section 760 of the Code of Civil Procedure, which is in these words: "Whenever from any cause it is, in the opinion of the court, impracticable or highly inconvenient to make a complete partition, in the first instance, among all the parties in interest, the court may first ascertain and determine the shares or interests respectively held by the original co-tenants, and thereupon adjudge and cause a partition to be made, as if such original co-tenants were the parties, and sole parties in interest, and the only parties to the action, and thereafter may proceed in like manner to adjudge and make partition separately of each share or portion so ascertained and allotted, as between those claiming under the original tenant to whom the same shall have been so set apart, or may allow them to remain tenants in common thereof, as they may desire." Under this section, before any interlocutory decree for a partition is made, the rights of the parties must be ascertained by the court. The different sections of a chapter, in any one of the Codes, must be so construed as to reconcile all apparent conflicts, and if there are conflicting provisions in the different sections of a chapter, the provisions of the section last in numerical order must prevail, unless such construction is inconsistent with the meaning of such chapter. Such is the direction, in our judgment, of section 4484 of the Political Code.

Construing the sections 759, 763, and 764 together, it is evident that the rights of all the parties to the action must be ascertained and determined by the court before any partition can be ordered. Is there a different rule laid down in section

760? We think not. That section, in our judgment, does not dispense with ascertaining the rights of all the parties, but allows the further or additional ascertainment of the shares or interest respectively of each of the original co-tenants, and then adjudging a partition in the first instance of the land between the original co-tenants as if they were the only parties. To make such a partition so that it may be of any aid in making the further partition between all the parties to the action, it must be made to include in the land allotted to each co-tenant the possessions and improvements of each one claiming under him. To enable the referees to do this (for they cannot do it themselves), the court must ascertain the right and title of each party, showing under which of the co-tenants such party claims. The interlocutory decree must be made before there can be any partition ordered, that is, the rights of the parties determined by the court, and specified in such decree. Such, we think, is the meaning of section 760. An interlocutory decree must be made ascertaining and declaring the rights of all the parties. The court can, in addition to ascertaining the rights and title just mentioned, and specifying them in the decree, ascertain the rights and interests of the original co-tenants, and specify them also in the decree; indeed, this last mentioned may be done first, and then, after ascertaining the titles of the original co-tenants and all the parties, and declaring them in the decree, the court may thereupon adjudge and cause a partition to be made as of the original co-tenants.

The proper construction of section 760, in our judgment, is, under the conditions mentioned in it, to first ascertain and determine the shares or interest respectively held by the original co-tenants, as well as the shares or interest respectively held by each one of the parties to the action, and upon such ascertainment being made and a judgment rendered in accordance therewith, thereupon to adjudge and cause a partition to be made as if such original co-tenants were the sole parties in interest. We understand the foregoing provision as forbidding any partition until an interlocutory decree is made. The statute allows but one interlocutory decree. Therefore we say that the interests of each party to the action must be ascertained and determined before any interlocutory decree is made. If this is not so,

there must be two interlocutory decrees, and we find no warrant for this in the statute. This section is intended to allow, and does allow, two partitions, one as between the original co-tenants, and then another between all the parties to the action. After this first partition is made, which is allowed as an aid to accomplish the second one, the court is authorized to proceed " in like manner to adjudge and make partition separately of each share or portion so ascertained and settled as between those claiming under the original tenant to whom the same shall have been so set apart."

The language just above used is, " to adjudge and make partition"; as to the first partition the language used is, " to adjudge and cause a partition to be made." The words as to ordering partition are substantially the same in each case, the only difference being between the words that follow " adjudge and," as to the first partition, " adjudge and cause a partition to be made," and as to the second partition " adjudge and make partition." Thus two partitions only are allowed; one preliminary and ancillary to the other, partial in its character; the other complete, and embracing all parties to the action. Though there are two partitions, there is but one interlocutory decree. This being the case, the interlocutory decree should embrace all the rights to be ascertained and determined, those of the original co-tenants, and also of all the parties to the action. These rights, so ascertained, should be set out clearly in the decree. And the interlocutory decree or judgment is not complete until this is done. The judgment in this case is not so made, and hence there is no complete interlocutory judgment. A further reason is suggested to us as sustaining the view that there is but one interlocutory judgment, which is to be found in section 939, Code of Civil Procedure, regulating appeals. It allows " an appeal from an interlocutory judgment in actions for partition of real property," and from interlocutory judgments in such actions. We think it clear that the statute did not intend to allow more than one appeal from the interlocutory judgment in partition. It was not intended that parties to such actions should be put to the trouble and expense of several appeals from a judgment of this character

It may be that the interlocutory judgment may in form be

divided into two parts, one part directing a partition as to the original co-tenants, as above indicated, and the other part directing a partition between all the parties; but when this is the case the two parts constitute the interlocutory decree or judgment. That there is but one such judgment is borne out by all the provisions of the chapter of the Code of Civil Procedure in relation to partition. We refer particularly to sections 759, 761–765, Code of Civil Procedure.

The interlocutory decree herein adjudges that the partition of the rancho San Pablo shall be made, in the first instance, in accordance with the provisions of section 760, Code of Civil Procedure, as among the original co-tenants, and according to the shares and interests, as ascertained and determined in the decree to have been originally held by them respectively, and as if they were the sole parties to the action, and that thereafter, upon due proceedings for that purpose to be instituted and taken, partition shall in like manner be adjudged and made separately of each share or portion so ascertained and allotted as between those claiming under the original co-tenants to whom the same shall have been so set apart, or that they may be allowed to remain tenants in common thereof, as they may desire.

The decree then proceeds to declare who are the original co-tenants among whom partition in the first instance shall be made, and the shares and interests of each of such co-tenants, as follows: Martina Castro de Alvarado, fifteen equal twenty-second parts of said rancho; Antonio Castro, Joaquin I. Castro, Juan José Castro, Gabriel V. Castro, Victor Castro, and Jesus Maria Castro, each one equal twenty-second part of same; Luisa Moraga de Briones, Maria de los Angeles Moraga de Briones, José Moraga, Guadalupe Moraga de Martinez, Francisco Moraga, each one equal one fifth part of one equal one twenty-second part of same.

The decree then proceeds to appoint referees to make the partition, divide and allot the several portions of the rancho to the original co-tenants as aforesaid, giving to each share and interest its due proportion of land, quality and quantity relatively considered, and directs the referees after excepting the ways, roads, and streets, afterwards referred to in the decree, to divide and allot to the original co-tenants as follows:—

1. A portion of said rancho, equivalent to fifteen twenty-second parts thereof, quality and quantity relatively considered, and in as far as praticable, without prejudice to any other interests, including the so-called "Alvarado homestead," and the improvements and possessions of persons claiming under said Martina Castro de Alvarado, to be allotted and set aside by the referees, to be known as the " Martina Castro de Alvarado share and interest," which will thereafter, as the decree proceeds, "upon due proceedings had in accordance with law, be separately partitioned between those persons claiming under said Martina Castro de Alvarado according to their respective rights."

A like direction *mutatis mutandis* is given to the referees with regard to the shares above indicated of each of the original co-tenants above mentioned, giving a name or title to each share, adopting for that purpose, as in the one just above stated, the name of the original co-tenant to whom the portion is to be allotted — for instance, the "Antonio Castro share and interest," the "Joaquin I. Castro share and interest," the "Luisa de Moraga share and interest," etc.

It is then directed that the improvements and possessions of persons claiming under the co-tenants aforesaid are, as far as practicable, without prejudice to any other interest, to be included "in said respective shares and interests so to be allotted, segregated, and set aside," in manner following: The "Martina Castro de Alvarado share and interest" is to include all the improvements upon the tracts of land known upon Gray's map of the rancho San Pablo, filed for record in the recorder's office of said Contra Costa County on August 28, 1857, as lots 58, 170, 131, south ninety-nine acres of 55, 79, 80, 105, east half of 31, west forty acres of 172, 46, part of 81 north of road and 51, and six acres of 112 northeast of county road.

Like directions are given *mutatis mutandis* as to the other shares and interests, directing location by reference to Gray's map, and in one instance, that of the Juan José Castro share and interest, reference is made to a tract of land (to be included in said share) of one hundred and forty acres, "now in the possession of H. A. Benson, and including his improvements, described in a certain deed from John H. Saunders and H. P.

Hepburn to said Benson, dated January 28, 1857, recorded in the county recorder's office of said Contra Costa County on January 29, 1857, in volume 5 of deeds, page 327."

A direction is then made that the improvements heretofore specially referred to, to be embraced in the respective shares if the same can be done without prejudice to the other shares, are to be included without placing any value on them, and a direction is then given in accordance with the statute, Code of Civil Procedure, section 764, as to setting apart portions of the rancho for ways, roads, and streets.

Further directions are made to the referees to proceed without delay to divide the rancho, and allot the several portions thereof to the said original co-tenants, designating each of such portions by proper landmarks, with authority to employ a surveyor mentioned, with the necessary assistants to aid him, that the allotments to each share may be in one or more parcels, as may be most convenient, "and in accordance with the reservations, improvements, and interests hereinabove provided for," that the referees make a written report to the court of their proceedings, etc. The decree concludes with a description, by metes and bounds, of the rancho San Pablo, taken from the patent of the United States above referred to, and a declaration is added to this description that by the grant, decree, and survey, the south boundary of the San Pablo Ranch is identical with the north line of the rancho San Antonio, or Peralta Ranch.

A summary of this decree is given, as some important questions arise thereon, which are to be considered and determined. The statute in reference to partition (see Code of Civil Procedure, §§ 752, 753, *et seq.*) declares that the rights of the several parties plaintiff and defendant may be put in issue, tried, and determined in the action; and when a sale of the premises is necessary (to effect a partition) the title must be ascertained by proof to the satisfaction of the court before the judgment or sale can be made. (Code Civ. Proc. § 759.)

By section 763 of the Code of Civil Procedure it is provided that if it be alleged in the complaint and established by evidence, or if it appears by the evidence without such allegation in the complaint, to the satisfaction of the court, that the property, or any part of it, is so situated that partition cannot be

made without great prejudice to the owners, the court may order a sale thereof. Otherwise, upon the requisite proofs being made, it must order a partition, according to the respective rights of the parties, as ascertained by the court, and appoint three referees therefor; and must designate the portion to remain undivided for the owners whose interests remain unknown or are not ascertained.

It is enacted by the section next ensuing, 764, that in making partition the referees must divide the property and allot the several portions thereof to the respective parties, quality and quantity relatively considered, *according to the respective rights of the parties* as determined by the court, pursuant to the provisions of this chapter, designating the several portions by proper landmarks, etc. Various other directions are given in this section as to the duties of the referees, which need not be here detailed. The referees are required to make a report of their proceedings, specifying therein the manner in which they have executed their trust, and describing the property divided and the shares allotted to each party, with a particular description of each share. (Code Civ. Proc. § 765.) The court may confirm, change, modify, or set aside the report, and if necessary appoint new referees. Upon the report being confirmed, judgment must be rendered that such partition be effectual forever. (Code Civ. Proc. § 766.)

In the system of partition devised by statute in this State, as in the common-law action of partition, and the proceeding for that purpose in a court of chancery, there were two judgments, an intermediate or interlocutory and a final judgment. Mr. Freeman, in his work on Co-tenancy and Partition, section 516, styles the interlocutory judgment *the first judgment.* He has accurately stated the proceedings (see §§ 516, 517, *et seq.*), both in law and equity. According to his statement, whether the proceeding was at law or in equity, it was first necessary to decide whether the parties were co-tenants and entitled to partition.

The question being resolved in the affirmative, it was next necessary to determine *the respective moieties* of each of the parties. "The result of the decision of these two questions was the judgment *quod partitio fiat.* This was the first or interlocutory

judgment in partition. It directed that partition be made between the parties, and commanded the sheriff to go to the premises, and in the presence of the parties, if they be willing to be present, after being first forewarned, 'by the oath of good and lawful men of his county, respect being had to the true value of the said tenements with the appurtenances, he cause to be divided' into certain moieties which the judgment proceeded to specify, and that he deliver one moiety to A. and another to B., etc. In chancery the decree for partition ordered, (1) that a partition be made between the plaintiffs and defendants, in certain moieties which it specified; (2) that a commission or commissions issue to certain persons to be therein named; (3) that the commissioners do make a partition [here specifying the manner in which it shall be made]; (4) that all writings, surveys, muniments of title, etc., be produced before the commissioners; (5) that the commissioners examine witnesses as they may think fit; (6) that after such partition has been made the parties execute conveyances to each other respectively. The decree, in addition to these directions, usually contained another in reference to the title deeds, and one in regard to costs."

The learned writer cites as authority for the above statements : 3 Ch. Pl. 1392; Booth on Real Actions, 244, 245; Seton's Forms, 184; Daniell's Ch. Pr. 4th ed., 2254. But "whether the proceeding was at law or in equity, the province of the court was to determine between whom, and in what proportions, the division should be made. In no case could the commission determine title, or prosecute any inquiry in regard thereto." (Freeman on Co-tenancy and Partition, § 517, citing *Ham* v. *Ham*, 39 Me. 218; *Agar* v. *Fairfax*, 17 Ves. Jr. 542; *Phelps* v. *Green*, 3 Johns. Ch. 304; *Ledbetter* v. *Gash*, 8 Ired. 463; see also *Calmady* v. *Calmady*, 2 Ves. Jr. 568.)

It will be observed that in the proceeding at law the *moieties* are specified in the interlocutory judgment. In *Agar* v. *Fairfax*, 17 Ves. Jr. 542, the master of the rolls (Sir William Grant) said that the writ of partition always stated the proportions in which the partition was to be made. This was the writ which issued on the first judgment, and is called the writ *de partitione facienda*. (See 3 Ch. Pl. 1394, 1401.) The entire record in an action for partition at law may be found in 3 Ch. Pl. 1396, *et seq.*

By an examination of the references just above given, the form
of the writ *de partitione* may be seen, in which it will be
observed that the moieties in which the land is to be divided are
distinctly specified.   The moieties are also specified in the decree
in the proceeding in chancery and the commission issued
thereon.

This was the very point in judgment in *Agar* v. *Fairfax*,
above cited.   In that case the master of the rolls said: "It
seems to me to have been soundly objected, that it is impossible
in the present situation to issue a commission; as then it must
be referred to the commissioners, first, to ascertain their inter-
ests, and the proportions in which they are entitled [referring
here to the interests and proportions of the co-tenants], and then
to make the allotment.   The former was never done by com-
missioners.   The court is to ascertain the proportions and rights
of the parties; and when that is done, then the duty of the com-
missioners begins, to make the division in those ascertained
proportions."   (17 Ves. Jr. 543.)

The master of the rolls directed a reference to the master to
ascertain the estates and interests of the parties and report to
the court.   On a petition for an appeal this order was in sub-
stance affirmed by Lord Chancellor Eldon, following *Calmady*
v. *Calmady*, 2 Ves. Jr. 568, above cited.   In this case the lord
chancellor said: "This court issues the commission, not under
the authority of any act of parliament, but on account of the
extreme difficulty attending the process of partition at law;
where the plaintiff must prove his title, as he declares, and also
the titles of the defendants; and judgment is given for partition
according to the respective title, so proved.   That is attended
with so much difficulty, that by analogy to the jurisdiction of a
court of equity in the case of dower, a partition may be obtained
by bill.   The plaintiff must, however, state upon the record his
own title and the titles of the defendants; and, with a view to
enable the plaintiff to obtain a judgment for partition, the court
will direct inquiries to ascertain who are, together with him,
entitled to the whole subject.

"If, therefore, the state of the record, as originally framed, is
not such as to authorize the court to say that the plaintiff and
the defendants are respectively entitled in distinct shares com-

prehending the whole subject, the proper course is to direct a reference to the master, to ascertain what are the estates and interests of the plaintiff and defendants, respectively ; and if it appears that they, or some of them, are entitled to the whole, then to order a partition, according to the rights of all, or such of them as appear entitled, dismissing the bill as against those who do not appear to have any right. The decree in *Calmady* v. *Calmady* is perfectly regular, directing the inquiry, and afterwards a commission to issue, to divide the estate among the several parties who appear upon the master's report entitled to it." (17 Ves. Jr. 552, 553.)

It thus appears clearly that the moieties in which the partition is to be made are specified in the first judgment, and the writ *de partitione facienda* issued thereon in the action at law, and in the first judgment, and the commission issued thereon in the suit in chancery, and that in neither case are the shares or interests of the parties or any matter of title to be determined by the sheriff in the one case or the commissioners in the other.

We think this is clearly the case under our system, from the provisions above cited from the Code of Civil Procedure, viz., that before any partition is ordered or can be made, the interests and shares of the parties are to be determined and adjudged by the court. (See *De Uprey* v. *De Uprey*, 27 Cal. 39 ; *Lorenz* v. *Jacobs*, 53 Cal. 24); and the moieties in which the land is to be partitioned; and such moieties must be specified in the interlocutory judgment, so that the referees may have no question of title to determine, and that they may intelligently discharge the duties as to making the allotments devolved on them by the decree. The provisions referred to are in sections 759, 763, 764 of the Code of Civil Procedure. In no case should a question of title be left to the referees.

In the decree herein this rule is not observed. The referees have to determine questions of title in order to execute the decree. As stated above, the referees are directed, in making the partition ordered by the judgment, to include in the respective shares and interests indicated in the judgment, " the improvements and possessions of persons claiming under the cotenants aforesaid, as far as practicable, without prejudice to any other interest." The referees will be compelled to determine

who the persons are who claim under the respective original co-tenants, or they cannot execute the directions of the judgment. The judgment, which will be in their hands in the shape of a certified copy, is their only authority to act at all. This reference of a title to be determined by them is irregular, contrary to the statute, and a duty is thus imposed on them by the court which it has no right to impose.

Under the general laws of the land, and the enactments of the statute, the parties have a right to have all such questions determined by the court. And the court has not the power without the consent of the parties to delegate such power to another tribunal, officer, or person. In some instances in this cause more than one party is claiming the same interest, and the party out of possession may claim that the party in possession is holding for him. How can the directions of the judgment be executed without determining these questions? These are questions of title, and may be difficult of determination. Must not the court determine them? It appears to us that this is clearly the duty of the court, conferred on it by the law of the land, which it cannot put away or evade. The court should determine who the parties are who claim under the respective cotenants, whose improvements and possessions are to be included in the particular share or interest, specifiying such persons and their possessions in the decree or judgment, so that the referees may be clearly informed as to their duties, which are mainly if not entirely ministerial. They can then execute the directions of the decree, without having to determine any questions of law in reference to title of any of the parties.

The pointed language of the master of the rolls and of the lord chancellor in *Agar* v. *Fairfax*, above quoted, on this subject in relation to the writ of partition, and to the commission issued in the chancery suit for partition, is worthy of observation in this connection. (See also *Ham* v. *Ham*, 39 Me. 218; 1 Story's Eq. Redf. ed., § 650; and note 1, § 651.) The proceeding in this State very much resembles the suit by bill, in fact is almost identical with it. In *Gates* v. *Salmon*, 35 Cal. 593, which was a case for a partition, it is said by Rhodes, J., speaking for the court of the action for partition, in this State, that "the action, though regulated to a great extent by the statute,

partakes more fully, both in respect to the remedies provided and the mode of procedure, of the principles and rules of equity than those of law"; and further in the same case (p. 596) he remarked " that the main features of the action, as prescribed by the statute, closely resemble those of a suit in equity brought for the same purpose."

*Ham* v. *Ham,* cited from Maine, was a case of partition under the statute of that State. As to the ascertainment of title, it appears to be substantially the same as that of this State. See Rev. Stats. of Maine of 1857, ch. 88, title 9, pp. 557, 558, where the provisions referred to in the opinion appear. The same is true in New York, viz., that the titles must be ascertained by the court. (See 5 Wait's Prac. 87, *et seq.*, and pp. 91 and 93, where the forms of the interlocutory judgments are given ; see also 3 Wait's Prac. 95, and pp. 346, 347.)

In section 764, the following provisions were made : " Before making partition or sale, the referees may, whenever it may be for the advantage of those interested, set apart a portion of the property for a way, road, or street, and the portion so set apart shall not be assigned to any of the parties or sold, but shall remain an open and public way, road, or street, unless the referees shall set the same apart as a private way for the use of the parties interested, or some of them, their heirs and assigns, in which case it shall remain such private way. Whenever the referees have laid out on any tract of land roads sufficient, in the judgment of said referees, to accommodate the public and private wants, they shall report that fact to the court, and upon the confirmation of their report all other roads on said tract shall cease to be public highways. Whenever it shall appear in an action for partition of lands, that one or more of the tenants in common, being the owner of an undivided interest in the tract of land sought to be partitioned, has sold to another person a specific tract by metes and bounds out of the common land, and executed to the purchaser a deed of conveyance, purporting to convey the whole title to such specific tract to the purchaser in fee and in severalty, the land described in such deed shall be allotted and set apart in partition to such purchaser, his heirs or assigns, or in such other manner as shall make such deed effectual as a conveyance of the whole title to such segregated

parcel, if such tract or tracts of land can be so allotted or set apart without material injury of the rights and interests of the other co-tenants who may not have joined in such conveyance; *provided*, that in all cases the court shall direct the referees in making partition of land to allot the share of each of the parties owning an interest in the whole or in any part of the premises sought to be partitioned, and to locate the share of each co-tenant, so as to embrace, as far as practicable, the improvements made by such co-tenant upon the property, and the value of the improvements made by the tenants in common must be excluded from the valuation in making allotments, and the land must be valued without regard to such improvement, in case the same can be done without material injury to the rights and interests of the other tenants in common owning such land."

These provisions are usually inserted in the interlocutory decree in partition. We cannot see how these provisions can be carried out by the referees, unless the interest of each party is ascertained by the court and stated specifically in the decree. And when the decree for a partition is made, as it is in this case, the court must determine under which of the original co-tenants each party claims, and state it in the decree, so that the referees can perceive clearly and be enabled to execute the provisions in section 764, when inserted in the decree. The judgment herein should be so modified in this regard; that is to say, the judgment should be so modified as to specify in it the parties who claim respectively under the original tenant, and set forth the possessions of such parties as are to be included in the share allotted to such original tenant.

We think it proper to call the attention of court and counsel to the fact that there is a map referred to in the judgment as "Gray's map," as recorded in a certain office. Where a map or other paper is referred to in the judgment as a material part of it, it should be identified by the judgment and made a part of it; it should not be referred to as a paper recorded elsewhere. A contention might arise on the identity of the paper before the referees when they come to act, and therefore the document should be identified by the court, and this should appear in the judgment. (See *Crosby* v. *Dowd*, 61 Cal. 557.)

If, by reason of any acts of the parties to the alleged parti-

tion of 1856, any equities have grown up in favor of any of the parties to this action, or of those under whom they claim against any of the parties to it affecting their interests in the land to be partitioned, we cannot see any good reason why they should not be enforced and adjudicated herein and be allowed their proper effect in the final decree of the partition to be rendered in the action. Under the chapter (4, title 10, part 2) of the Code of Civil Procedure touching actions for the partition of real property, all equities arising between the parties, whether plaintiffs or defendants, concerning the land to be partitioned, can be determined. This relates to all equities, if any there are, whether arising under the so-called partition deed of 1856, or otherwise, not already passed on in the court below. The court below can yet pass on them in the further progress of the cause, can make such findings on the issues not yet found on as may be proper, and allow them their just legal effect in its judgment.

If it is requisite to find on any issue made by the allegations of any answer, which allegations it is argued are in support of the alleged partition of 1856, it can yet be done when the cause goes back to the court *a qua;* but we cannot see that any of these allegations, or the issues arising on them, are material, in the view taken of the instrument of 1856, by the court below and this court, viz., that it is no partition at all.

An appeal was taken from the order in this cause appointing a receiver, and we are asked to review it. We are met with the contention on behalf of respondents that the order above mentioned is not appealable in its character. This order was made on the 18th of November, 1878, after the rendition of the interlocutory decree, which was on the 15th of July, 1878. On the question whether such order is appealable or not, we are referred to many decided cases by counsel for the respective parties.

The *French Bank Case,* 53 Cal. 550, was an application for a writ of *certiorari* to review an order in the case appointing a receiver. In passing upon the point discussed, whether the case made was one for the writ of *certiorari,* the court said: "The statute concerning this writ, section 1068, provides that it may be resorted to 'when . . . . there is no appeal,' etc. If

there be an appeal, the writ of *certiorari* cannot be awarded; but no direct appeal is given by the statute, and we are of opinion that such an order is not subject to be reviewed on an appeal from the judgment under section 956 of the Code of Civil Procedure."

In the case under discussion, as we have stated above, the order for the receiver was made after the interlocutory judgment. In the case cited, the order was made *ex parte* at the time of the filing of the complaint. No final judgment had been entered in this case, and therefore the appeal cannot be sustained as one taken from a special order made after final judgment. In *Whitney* v. *Buckman*, 26 Cal. 448, which was an action of ejectment, after verdict and judgment for plaintiff, a receiver was appointed. Subsequently an order was made that the receiver pay over the money in his hands to the prevailing party, and from this order an appeal was taken. The court held that the order appointing the receiver, which was not appealed from, could not be reviewed on the appeal which was taken from the subsequent order. It may be that an appeal could have been taken from the order of appointment, as a special order made after final judgment, and such, it may be, was the view of the court in the case cited, though it is not said expressly. But the ruling in *Whitney* v. *Buckman* cannot be considered in any way an authority that an appeal can be taken in the case before us.

In *Williamson* v. *Monroe*, 3 Cal. 385, which is cited on behalf of appellant, it does not clearly appear from what the appeal was taken, but it may well have been taken from the order appointing the receiver, as the practice act then in force allowed an appeal from any order made affecting "a substantial right in an action or special proceeding." (Pract. Act of 1861, § 347, Stats. 1861, p. 106.)

*Guy* v. *Ide*, 6 Cal. 99, was an action to foreclose a mortgage. Prior to judgment a receiver of the rents and profits was appointed. A judgment of foreclosure was rendered, and afterwards a motion was made to vacate the order appointing the receiver. This motion was made by Ide, who was a purchaser from the mortgagor, subject to the mortgage. The motion was denied, and the appeal was taken from the judgment and the order denying the motion to vacate. The court affirmed the

judgment, and reversed the order appointing a receiver. No point was made as to the appealability of the order. Its appealable character was not contested, and it may well have been that counsel waived this point, desiring to have the opinion of the court on the point decided as to the receiver. It may be remarked, *that the order appealed from* was one made after final judgment in the action, and it may be that it was accepted as one appealable in consequence, as a special order made after final judgment.

In *Neall* v. *Hill*, 16 Cal. 149, the appeal was from a final judgment, and the appointment of the receiver was made by the judgment or decree. The judgment was reversed, and the order of appointment (from which no appeal was prosecuted), as a part of the judgment, shared its fate.

*Corcoran* v. *Doll*, 35 Cal. 479, was an appeal from " an order granting an injunction and appointing a receiver." The court affirmed the order. The order granting the injunction was appealable, and the appeal brought up the whole order, just as in *Neall* v. *Hill* the appeal from the final judgment brought up the order appointing the receiver as a part of it. The order in *Corcoran* v. *Doll* was a writ, as was the judgment in *Neall* v. *Hill*. The reversal of the judgment in the latter case reversed the entire judgment, as the affirmance of the order in the former affirmed all its parts. The court, in *Corcoran* v. *Doll*, treated the order as but one order.

In *Meadow Valley Mining Co.* v. *Dodds*, 6 Nev. 262, the appeal was from an order made before trial, in which order there were words of restraint upon the defendants, and also language appointing a receiver. The order is stated at length in the opinion of Lewis, C. J., on pages 262, 263. The question whether the statute allowed an appeal from this order was considered by the court. The statute of Nevada allowed an appeal "from an order granting or dissolving an injunction." The court held that the order, so far as it related to the appointment of a receiver, was not appealable. So far as it could be considered as an order of injunction, the court, of course, under the statute, did take cognizance of the appeal, and affirmed the order.

We consider this a distinct ruling, that an order appointing a

receiver is not appealable.   And as the statute of Nevada is, so
far as concerns the question under consideration, like the statute
of this State, we hold it to be authority on the point of the char-
acter of the order as to its appealability.   The case from Nevada,
and the *French Bank Case* above cited, expressly hold that such
an order is not appealable.   We find none holding the contrary.

We do not consider Schlecht's Appeal, 60 Pa. St. 172, as lay-
ing down a different rule.   We interpret that case as reversing
an order appointing a receiver, because it was part of an injunc-
tion, from which an appeal was and could, under the Pennsyl-
vania act of assembly, be prosecuted.   The court professes to
reverse the receiver order only in this way, and does not treat
the latter order as at all appealable.   The decree for an injunc-
tion and receiver was declared by the court to be a unit; and as
it was erroneous in part as to the injunction, such error affected
the entire decree, and must have led to a reversal, though the
order of appointment may have been lawful and regular.   There
is nowhere in the clear and unmistakable language of the opinion
any intimation that the order appointing a receiver is appealable.
On the contrary, the intimation is the other way.

But it is argued, and with much plausibility, that the order
here appealed from is in fact an injunction, and the appeal should
be upheld as one from an order granting an injunction.   It is
argued that the order, if executed, must operate as a restraint
upon the rights of the parties to hold and manage their lands.
While this may be so, still there are no restraining words used
in the order, and we cannot then hold it an injunction order.   If
we held such an order to be an injunction, the same must be
held as to every order appointing a receiver, for such orders,
when executed, must to some extent be a restraint upon the
rights of some one.

Moreover, we cannot conclude that we should be justified in
holding that the law-making power intended to give an appeal
in so important a matter as the appointment of a receiver, by
the words giving an appeal upon granting an injunction.   Should
we so hold, ought we not also to rule that an appeal is given
from an order refusing to appoint a receiver, by the words
which allow it when an injunction is refused?   It will be observed
that "injunctions" and "receivers" are treated of in distinct

and separate chapters of the Code of Civil Procedure. On granting an injunction, an undertaking with sureties is, with a few exceptions, always required of the applicant (Code Civ. Proc. § 529); while in the case of the appointment of a receiver, such an undertaking is only required of the applicant when such appointment is asked for *ex parte*. (Code Civ. Proc. § 566.) The condition required in the former undertaking is entirely different from the one required in the latter. (See sections last cited.)

If an order appointing a receiver is an injunction order, then the undertaking prescribed by the law upon making the latter order must be required and given on making the order for a receiver, or the procedure will be irregular. According to our observation of the practice, such an undertaking is never required when a receiver is appointed. This shows unmistakably a general concurrence, both by bench and bar, that an order appointing a receiver is not an injunction.

Considering all these circumstances, we are of opinion that we should go astray from the law in holding that the order appealed from is an injunction, and appealable as such. We feel compelled, although strongly impressed with the argument of counsel for appellants, to hold that the order appointing the receiver in this case is not appealable, and that the appeal from it should be dismissed.

In holding the order here not appealable, we are in accord with the *French Bank Case* and *Meadow Valley Mining Co.* v. *Dodds*, above cited. In the latter case the court expressed the opinion that such an order would be reviewed on an appeal from the final judgment. This was clearly *obiter*, as no such question was before the court for decision. The contrary conclusion was reached by our predecessors in the *French Bank Case*, where the question was presented for decision. The question does not arise here, and we decide nothing in regard to it. If an appeal should be allowed from an order appointing a receiver, the legislature will no doubt supply the proper legislation. In accordance with the foregoing, it is ordered that the appeal from the order appointing a receiver be and is hereby dismissed.

It is further ordered that the court below, on the return of

this cause to it, do proceed to vacate the orders denying a new trial as prematurely made, and upon such evidence as has been already taken, and such other and further evidence as will be adduced by the parties, proceed to determine the issues as to the tax assessments and the tax levies mentioned in the twenty-seventh, twenty-eighth, twenty-ninth, thirtieth, thirty-first, and thirty-second findings, and as to the judgments of Justices' Courts mentioned in the thirty-first and thirty-second findings, and find the facts as to the same in accordance with the directions of this opinion; that as to any issues of fact not already determined in this cause, that it proceed upon such evidence as has been already taken, and upon such other and further evidence as shall be adduced before it, to determine such issues and find the facts in regard to the same, taking care in all cases where there is a contest as to a fact to find the naked fact segregated from any question of law. The findings of fact, except as to the issues above mentioned to be passed on, are correctly determined.

And it is further ordered that the judgment be set aside and reversed, and that the court below on the return of this cause to it do proceed and ascertain and determine the rights and interests of all parties to the suit in the land to be partitioned, and that after all issues of fact yet to be tried have been determined and the interests of all parties in the land to be divided, ascertained, and determined, that the court will proceed upon the findings heretofore made and herein approved, and those hereafter to be made under the directions of this court, to render the first or interlocutory judgment herein; that it specify in said judgment the rights and interests of all parties to the action, that it then proceed to adjudge a partition of the land between the parties according to the rights and interests so ascertained and determined, with liberty to the court, if it should be of opinion that the conditions exist as prescribed by section 760 of the Code of Civil Procedure, to order by such judgment a partition in accordance with such section among the original tenants; and if such partition is ordered under said section 760 that the said court should specify in the judgment the parties claiming under the original co-tenants, whose possessions and improvements are to be embraced and included in the share allotted to the original

tenant under whom they claim; and after making such partition among the original tenants, that it proceed to adjudge and make partition so ascertained and allotted as between those claiming under the original tenant to whom the same shall have been so set apart, or allow them to remain tenants in common thereof as they may desire.

And it is further ordered, that in all further proceedings herein in the court below, regard be had to the rules laid down in the foregoing opinion.

MORRISON, C. J., and MYRICK, J., concurred.

SHARPSTEIN, J., concurring. — It being the opinion of the majority of my brethren that the findings of the court below, with the exceptions specified by MR. JUSTICE THORNTON, ought not to be disturbed, I concur in the foregoing judgment.

McKEE, J., concurring. — I concur in the judgment of reversal. The first thing necessary to be done by a court in which an action of partition has been commenced is to obtain jurisdiction of the persons of those who claim to be entitled to the land sought to be partitioned. Having obtained jurisdiction by any of the modes prescribed by law for that purpose, the parties of whom jurisdiction has been obtained are required to answer as to the nature and extent of their respective interests; and if any of the answers made raise issues of adverse claims for any parts of the land, the court must then proceed to try and determine such issues. As in an action for the settlement of partnership affairs, the first inquiry is whether the parties to the suit are partners, so in an action of partition the first inquiry must be, whether all the parties to the action are tenants in common; and that inquiry can only be reached after the final determination of the rights asserted by adverse claimants to any parts of the land; for the issues raised by the assertion of such rights are in the nature of issues of law, and must be decided before any steps can be taken in the proceeding for partition. It is only after their decision that the court can know who are entitled to partition.

And having disposed of those issues, and ascertained who are the tenants in common, between whom the land is to be parti-

tioned, the next step in order is to ascertain and determine the respective rights and interests of each of the tenants in common in the mode prescribed by sections 763–765, and 799, of the Code of Civil Procedure, and adjudge partition between them according to their respective rights.

The ascertainment and determination of these things in the order named are essential to the validity of an interlocutory decree in a partition proceeding. (Code Civ. Proc. ch. 4.) And such has been the procedure followed in such actions by courts of chancery from the time when the English court of chancery (by judicial construction of statutes 31 and 32, Henry VIII., which made joint tenants and tenants in common account-able to each other) assumed jurisdiction of actions of partition, upon the ground that under that statute tenants in common of real property held possession as trustees for each other. Before that statute partition at common law was not enforcible against either joint tenants or tenants in common. By the passage of that statute they were placed upon the same footing, as to parti-tion, with coparceners, and partition was enforced against them by a writ of partition; and concurrent jurisdiction of such actions was exercised by courts of law and courts of equity until the writ of partition was abolished by statutes 3 and 4, William IV., and thereafter the only mode of enforcing partition was by bill in chancery.

The procedure in chancery in actions of partition has been substantially embodied in the provisions of chapter 4 of the Code of Civil Procedure. In some circumstances it differs: in chancery, partition proceedings were suspended until the issues raised by adverse claimants to any portions of the land were tried and determined by actions of ejectment in the courts of law. The same legal effect follows the raising of such issues in a partition proceeding in this State, under the Code; only, instead of sending the parties to a court of law to litigate the questions of title between them, the court in which the proceed-ing is pending has jurisdiction to try and determine all issues, whether at law or in equity, and must determine them as part of the proceeding itself. (Code Civ. Proc. § 759; *De Uprey* v. *De Uprey*, 23 Cal. 352; *Morenhaut* v. *Higuera*, 32 Cal. 294; *Gates* v. *Salmon*, 35 Cal. 597), and until those issues are dis-

posed of, and the tenants in common of the property are ascertained and enumerated, and their respective interests and rights have been ascertained and determined, the case cannot be considered as tried. Section 760 of the Code of Civil Procedure is not in conflict with these views. That section provides:—

"Whenever from any cause it is, in the opinion of the court, impracticable or highly inconvenient to make a complete partition, in the first instance, among all the parties in interest, the court may first ascertain and determine the shares or interest respectively held by the original co-tenants, and thereupon adjudge and cause a partition to be made as if such original co-tenants were the parties and sole parties in interest, and the only parties to the action, and thereafter may proceed in like manner to adjudge and make partition separately of each share or portion so ascertained and allotted as between those claiming under the original tenant to whom the same shall have been so set apart, or may allow them to remain tenants in common thereof, as they may desire."

The thing to be observed is, that the authority of the court "to adjudge and cause a partition to be made between the original co-tenants, as if they were the parties and the only parties in interest, or to the action," is made to depend upon the fact that it will be made "impracticable or highly inconvenient to make a complete partition, in the first instance, between *all* the parties in interest." But who are all the parties in interest? That must be ascertained and determined before it can be decided whether a complete partition in the first instance between the parties is impracticable or inconvenient. But how shall it be ascertained and determined before the issues made by the answers of adverse claimants are finally disposed of? The ascertainment of those who are "the parties in interest," or tenants in common of the land, is therefore a fact which lies at the threshold of every action of partition, and at the foundation of every one's right to partition; and whether it would be impracticable or highly inconvenient to make partition between them, in the first instance is also necessarily connected with the fact. Both are judicial questions, and the latter cannot be determined if the court has not ascertained and does not know who are the parties entitled to partition.

That has not been done in this case. Issues of law between adverse claimants of parts of the ranch sought to be partitioned have never been heard and decided. It has never been found who are the tenants in common of the ranch, and what are their respective interests and rights therein, or whether it would be to their prejudice, or impracticable or highly inconvenient, to make partition between them.

It may be, after it shall have been ascertained who are owners of the ranch, and what are their respective interests therein, that the court may find it neither impracticable nor inconvenient to make partition between them. If so, it would plainly be the duty of the court to decree partition in the first instance between them, without the necessity of double investigations, double interlocutory decrees, double commissioners, double reports, double confirmations of reports, and without the burden of costs and expenditures which such an elaborate judicial proceeding would entail.

I therefore think the interlocutory decree should be reversed, because the court has not heard and determined the issues raised in the proceedings by the answers of adverse claimants to portions of the ranch; because it has not been ascertained who are the tenants in common of the ranch; and because the respective rights and interests of the tenants in common have not been found. The court below should be directed to proceed to hear and decide these things upon the evidence already taken in the case, and such other evidence as may be given by the parties.

Ross, J., dissenting. — I dissent from the judgment, and am of the opinion that the interlocutory decree appealed from should be affirmed. Except with respect to the construction of section 760 of the Code of Civil Procedure and to the findings in relation to taxes and judgments for taxes, I agree with the conclusions reached, and with much that is said in support of them in the opinion of MR. JUSTICE THORNTON. I do not agree to the conclusions reached in the opinion in regard to the findings just alluded to, nor am I able to agree with my associates in their construction of section 760 of the Code of Civil Procedure. By them it is held that under no circumstances can any interlocutory decree in partition be made until the interest of each

and every owner is first ascertained and determined. In the absence of the above-cited statutory provision, that would undoubtedly be so. But the legislature has seen fit to declare that "whenever from any cause it is, in the opinion of the court, impracticable or highly inconvenient to make a complete partition in the first instance, among all the parties in interest, the court *may* first ascertain and determine the shares or interest respectively held by the original co-tenants, and thereupon adjudge and cause a partition to be made as if such original co-tenants were the parties and sole parties in interest, and the only parties to the action, and thereafter may proceed in like manner to adjudge and make partition separately of each share or portion so ascertained and allotted, as between those claiming under the original tenant to whom the same shall have been so set apart, or may allow them to remain tenants in common thereof, as they may desire." (Code Civ. Proc. § 760.)

It seems to me that the view taken by my associates in effect nullifies this provision of the statute.

McKINSTRY, J., being disqualified, took no part in the decision.